**Opinion issued October 28, 2014.**



In The

# Court of Appeals

For The

# First District of Texas

————————————

## NO. 01-13-00567-CV

————————————

**CCC GROUP, INC., Appellant**

**V.**

**SOUTH CENTRAL CEMENT, LTD., Appellee**

---

**On Appeal from the 61st District Court**
**Harris County, Texas**
**Trial Court Case No. 2009-50242**

---

## O P I N I O N

South Central Cement, Ltd. prevailed at trial on its claims that CCC Group, Inc. breached a contract and was negligent in connection with the construction of a cement-storage warehouse that collapsed. On appeal from the judgment, CCC argues that the evidence is legally and factually insufficient to establish that it

breached any contract, the cause of the structure's failure, or any resulting damages. We conclude that no evidence supports the jury's award of future repair damages. Consequently, we reverse and remand for a new trial.

## Background

South Central Cement, a subsidiary of a holding company known as Grupo Argos, imports cement and sells it in Texas. In 2006, South Central retained River Consulting, LLC to design a pair of warehouses at the Port of Houston. South Central intended to store dry cement in the warehouses, with each warehouse holding 22,000 tons, or one shipload, of cement.

South Central asked River to propose possible designs for the warehouses, accounting for cost and construction time. River proposed three designs: a silo, a dome, or a retaining wall built with stacked concrete blocks. South Central selected the retaining-wall design because it was the cheapest and fastest of the options and because South Central already had other facilities in the United States with similar walls. Those other facilities, however, were smaller, holding no more than 15,000 tons of cement each.

To accommodate larger volumes of cement at the Houston facility, River proposed a unique system consisting of three concentric walls, each made of stacked concrete blocks joined by epoxy. The outermost wall would be only 8 feet high, while the middle wall would be 16 feet high and the innermost wall would be

24 feet high. The blocks themselves would be 2 feet deep, 2 feet high, and 2 to 6 feet in length. In all, each warehouse required more than 3,000 blocks, to be cast in a series of metal forms, or molds.

River faced a design challenge with respect to the project. The concrete blocks in the three walls could prove unable to withstand the pressure of the cement because each of the three walls would tend to move independently, making the entire structure only as strong as a single layer of blocks. To address this problem, River designed a three-part system to allow the three walls to function monolithically, as though they were a single, extra-thick wall. First, each block had an angled extension on one end and an angled notch on the other, allowing two blocks aligned end-to-end to fit together. Second, each block would have a similar extension on its upper surface and a notch in its bottom surface. Third, and most important to this dispute, each block would have a set of shallow "keyholes" on its top surface. The blocks in each wall were to be laid so that their keyholes would align with the keyholes in blocks in the adjacent wall. This would result in a single keyhole, spanning two blocks. Into this space would be laid a "shear plate," a metal plate somewhat smaller than the keyhole, which would be in contact with four blocks: the two blocks on each side, both above and below. River's engineers calculated that the resulting friction between blocks and between blocks and plates

would result in the three concentric walls acting as a single wall due to the plates' ability to transfer shearing force from one block to another.

River recommended CCC Group and one other company as potential contractors to build the walls. South Central chose CCC, and River entered into a written agreement with CCC. South Central did not have a written agreement with CCC.

The first warehouse was known as Warehouse A. Shortly after construction began on Warehouse A, River realized that it had underbid the project and asked South Central to renegotiate its fees. Ultimately, River left the project instead.

CCC and South Central disagreed at trial about who assumed responsibility for project management and engineering after River's departure. According to CCC regional manager Darryl Mayfield, South Central assumed all such duties, and CCC's role as a contractor on the construction project remained unchanged. In contrast, Miguel Jaramillo, a port project manager for Grupo Argos, testified that CCC and South Central orally agreed that CCC would assume responsibility for both the construction and project management.

Once CCC began construction, it encountered difficulties placing the shear plates. After about 700 blocks had been placed, the keyholes in adjacent blocks were no longer lining up correctly. According to Mayfield and CCC's project manager, Michael Tucker, South Central's Carlos Gonzales and Uriel Duarte were

4

immediately informed of the problem, and both men responded that CCC should omit the shear plates and use only the epoxy to hold the wall together. CCC also informed River's David Grillot of the issue, and he responded, "They pay the bills. They're the owners." Both Gonzalez and Grillot disputed this version of events, testifying that no such conversations ever occurred; Duarte did not testify at trial.

The project continued, and in April 2007, Warehouse A prepared to receive its first shipment of cement. When the shipment arrived, CCC personnel were operating the facility and supervising the unloading process. Around midnight on April 27, 2007, portions of the retaining wall in Warehouse A failed, and the warehouse essentially "exploded," causing extensive damage to the building.

Because CCC was already present at the site, South Central asked CCC to perform cleanup and rebuilding of the walls. Because South Central feared another collapse, CCC rebuilt the damaged portions of the walls to a height of only 14 feet. The walls in Warehouse B, also originally planned for 22 feet, were likewise built to only 14 feet. For the cleanup and rebuilding, CCC charged and South Central paid $928,008.40.

In 2009, South Central sued CCC and River for breach of contract and negligence. River settled, while CCC proceeded to trial. A jury found for South Central on both the contract and negligence claims. For breach of contract, the jury awarded $556,800 for past repairs, $1,200,000 for future repairs, $552,000 for the

5

cost of past delays in the construction of the warehouses, and $359,400 as damages for the temporary reduction of the warehouses' capacity below the capacity for which South Central contracted. The jury also awarded South Central $150,000 in attorney's fees. On the negligence claim, the jury assigned 60% of the responsibility for the warehouse collapse to CCC and 20% each to River and South Central. As damages for negligence, the jury awarded exactly two-thirds of each of the amounts that it awarded for the contract claim.

The trial court entered judgment on the jury's verdict, assessing damages of $2,368,200 after accounting for CCC's settlement offset, plus pre-judgment and post-judgment interest, attorney's fees, and costs of court. This appeal followed.

## Analysis

On appeal, CCC argues that the evidence is legally and factually insufficient to support the jury's findings with respect to (1) CCC's breach of an agreement with South Central, (2) the cause of the retaining wall's collapse, and (3) damages for past and future repairs, delay, and reduced capacity. CCC also argues that because the jury's verdict with respect to the breach of contract was not supported by sufficient evidence, the award of attorney's fees must also be reversed.

When a party challenges the legal sufficiency of the evidence supporting a judgment, this court must look at all of the evidence admitted and determine whether, after disregarding all evidence that a reasonable trier-of-fact could

6

disregard, more than a scintilla of evidence supports the judgment. *City of Keller v. Wilson*, 168 S.W.3d 802, 827–28 (Tex. 2005). Evidence is legally insufficient if the record reveals the "complete absence of evidence of a vital fact"; if the only evidence supporting a judgment is incompetent, such that a court cannot consider it; if "the evidence does not rise above a scintilla [such that] . . . jurors would have to guess whether a vital fact exists"; or if the evidence "conclusively establishes the opposite of a vital fact." *Id.* at 811–14. In conducting a legal-sufficiency analysis, we review all of the evidence in the light most favorable to the verdict. *Id.* at 822.

To determine the factual sufficiency of the evidence, we are required to examine all of the evidence, and we will set aside the judgment only if it is so contrary to the overwhelming weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). Unlike a legal-sufficiency review, a factual-sufficiency review requires that we review the evidence in a neutral light. *Id.*; *Nelson v. Najm*, 127 S.W.3d 170, 174 (Tex. App.—Houston [1st Dist.] 2003, pet. denied). The trier of fact may choose to "believe one witness and disbelieve others" and "may resolve inconsistencies in the testimony of any witness." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986); *see also City of Keller*, 168 S.W.3d at 820–21.

"Generally, when a party presents multiple grounds for reversal of a judgment on appeal, the appellate court should first address those points that would afford the party the greatest relief." *Bradleys' Elec., Inc. v. Cigna Lloyds Inc. Co.*, 995 S.W.2d 675, 677 (Tex. 1999). Accordingly, we begin by addressing CCC's liability arguments because reversal on those grounds would result in rendition of judgment for CCC. *See id.*; *see also* TEX. R. APP. P. 43.3 ("When reversing a trial court's judgment, the court must render the judgment that the trial court should have rendered, except when (a) remand is necessary for further proceedings; or (b) the interests of justice require a remand for another trial.").

"The essential elements of a breach of contract claim are (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained as a result of the breach." *B&W Supply, Inc. v. Beckman*, 305 S.W.3d 10, 16 (Tex. App.—Houston [1st Dist.] 2009, pet. denied). CCC challenges the first, third, and fourth of these elements on appeal.

## I.    Existence and breach of contract

CCC argues that the evidence at trial was legally and factually insufficient to establish that it breached a contract with South Central. Specifically, CCC argues that the evidence does not support a finding that it was contractually obligated to install shear plates into the retaining wall. CCC focuses on testimony that South

Central agreed to the omission of the shear plates and contends that no evidence was presented to establish that the final wall design required the installation of the plates. We disagree.

Jaramillo testified that CCC and South Central entered into an oral agreement under which CCC bore the responsibility for both construction and project management after River's departure. Although CCC disputes this testimony, the jury could have believed it and disbelieved the testimony of CCC's witnesses that no such agreement existed. *McGalliard*, 722 S.W.2d at 697; *see also City of Keller*, 168 S.W.3d at 820–21.

CCC contends that Gonzalez, a South Central employee, consented to the omission of the shear plates during the course of construction. Gonzalez, however, testified that he did not do so. The evidence was not conclusive, but conflicted. Thus, the jury was free to believe Gonzalez and disbelieve testimony that South Central agreed to omission of the plates. *McGalliard*, 722 S.W.2d at 697; *see also City of Keller*, 168 S.W.3d at 820–21.

Moreover, CCC's own employees testified that the design that South Central hired CCC to build included shear plates. Tucker was asked, "What secures these blocks in place?" He responded, "The design was epoxy and the shear plates." He further testified that CCC installed shear plates where it could, although it did not install them everywhere. When asked whether CCC used River's design to perform

its construction work, he responded, "With the exception of the plates, yes." The next question asked, "Did the design of the block walls call for or require the addition of these—what I'll call shear plates?" Tucker answered simply, "Yes." Tucker also testified that he felt it necessary to inform River's Grillot when the plates were omitted.

Likewise, Mayfield testified repeatedly that "the original block design as provided by River" included the shear plates. He also documented this understanding in a May 2007 email to Gonzalez, Jaramillo, Tucker, and another CCC employee.

By contrast, CCC points to no evidence that the shear plates were only part of an early design and not part of the final design that it began to build. Rather, CCC merely suggests the possibility that either no "final" design ever existed or that the final design was the result of various oral changes by South Central and River that were never documented. Further, CCC does not attempt to reconcile its theory that the shear plates were not part of a "final" design with the fact that CCC did install some shear plates in the wall in Warehouse A.

We hold that the evidence was legally and factually sufficient to permit a reasonable juror to conclude that CCC was contractually obligated to install shear plates in the retaining wall in Warehouse A, that South Central did not agree to a

change in the design, and that CCC failed to install the plates, in breach of an agreement with South Central.

## II.    Causation

CCC argues that even if it had a contractual obligation to install shear plates, the evidence is legally or factually insufficient to support the jury's finding that the breach of this obligation caused South Central's damages. To recover, South Central must show that the damages that it suffered were "the natural, probable, and foreseeable consequence" of CCC's breach. *Mead v. Johnson Grp., Inc.*, 615 S.W.2d 685, 687 (Tex. 1981). CCC argues that South Central failed to do so.

CCC contends that the evidence regarding causation falls short in three ways. First, Jaramillo and South Central's own expert, structural engineer Peter James Arles, both testified that the wall failed because of flaws in River's design rather than the lack of shear plates. Second, the only witness who testified that the absence of the shear plates caused the wall's collapse, River engineer Karl Holloway, did not support his opinion with facts sufficient to support his conclusion. Third, although South Central introduced testimony of River's retained expert witnesses, that testimony did not provide any evidence regarding the cause of the wall's failure.

11

### A.    Jaramillo /Arles testimony

CCC is correct that Jaramillo and Arles testified that the wall failed due to a defective design. But the jury could have disbelieved these witnesses if other competent evidence tended to show that the design was not defective, but that the wall failed for other reasons. *McGalliard*, 722 S.W.2d at 697; *see also City of Keller*, 168 S.W.3d at 820–21.

### B.    Holloway testimony

Holloway, a licensed engineer with bachelor's and master's degrees in civil engineering, testified about the calculations that he performed in designing the wall. He explained that River determined that the wall would fail if the three component walls acted independently and would have preferred to build a single "cast-in-place" wall, but recommended shear plates because of timing and ease-of-constructability constraints. He also explained that he performed calculations showing that the installation of shear plates would make the wall 2.5- to 3.5-times more resistant to overturning than allowing the component walls to move independently. CCC did not object to any of Holloway's testimony, which was not elicited live but instead by deposition.

In a single paragraph, on appeal CCC characterizes Holloway's testimony as "conclusory" and attacks its sufficiency to support the element of causation on three grounds: (1) he did not link his conclusions to the facts; (2) he did not

"describe any investigation of the warehouse or consider any other possible factors that may have contributed" in the wall's collapse; and (3) he stated that it was impossible to determine after the collapse whether the blocks were properly stacked before the collapse. CCC also attacks Holloway's qualifications because he had never designed or worked on a retaining wall such as the one at issue and had no experience with retaining walls designed to contain bulk cement. CCC does not further elaborate on any of these bases as a reason that Holloway's testimony was incompetent to support the verdict.

We first reject CCC's contention that Holloway's testimony was somehow disconnected from the facts of the case. He designed the retaining wall, and the design included the shear plates. He visited the construction site after the wall failed, and he also reviewed pictures showing the damage. He was asked on direct examination:

> Q. . . . Do you have a belief of why you think these walls collapsed?
>
> A. Because the shear plates weren't put in.
>
> Q. Is that the only reason?
>
> A. That's the only reason I can think of.

On cross-examination, Holloway elaborated on the basis for his belief:

> Q. . . . Did you do anything to try to make a determination of what you believe the cause of the wall collapse was?

A. It was hard to determine how high the cement had actually been filled in the building because once the walls collapsed, the cement went out with it. But from what I could see the pipes by design were cut off 20 feet above the floor. It was obvious from the photographs and from visual observation while I was there that the cement had been filled higher than the bottom of those pipes because there was a crater, like a volcanic crater. Some had been pumped down there and so there was a hole where the pipe was but the cement came up several feet higher than the bottom of the pipe and tapered off towards the walls and that was true at the two ends of the building.

Q. Did you actually see cement above the bottom downspout of the pipe when you were there?

A. Yes. At the two pipe discharges at the ends of the building where it collapsed, it was higher than the bottom of the pipe.

Q. Was that not what this wall was designed to allow for?

A. The wall was designed to have—now, be aware that when the cement comes out and flows, it is going to have a little bit of slope to it.

Q. Right.

A. But if you brought more and more in and if you get above the bottom of that pipe, it will still slope away. So, I can't say how high it was at the wall, but it was higher than the 20 feet at the two end pipes.

As the designer of the retaining wall and having observed the aftermath of the collapse, Holloway demonstrated that he had a basis for his "belief" that leaving out the shear plates resulted in the wall's failure. And in light of this testimony, CCC's second criticism that Holloway failed to "describe any investigation of the warehouse or consider any other possible factors that may have contributed," is simply an incorrect characterization of the record.

14

CCC's third complaint about Holloway's testimony, raised for the first time on appeal, was that he stated there was "no way of knowing" whether the concrete blocks were stacked in the appropriate sequence. We conclude this complaint about the testimony is waived for failure to raise it at trial because it would require evaluation of Holloway's reasons for believing the lack of shear plates caused the collapse—an explanation that may have been provided at trial in the face of an objection, but which is absent from the record due to the lack of an objection. *See Coastal Transp. Co. v. Crown Cent. Petroleum Corp.*, 136 S.W.3d 227, 233 (Tex. 2004) ("[W]hen a reliability challenge requires the court to evaluate the underlying methodology, technique, or foundational data used by the expert, an objection must be timely made so that the trial court has the opportunity to conduct this analysis."); *Mar. Overseas Corp. v. Ellis*, 971 S.W.2d 402, 412 (Tex. 1998); *see also* TEX. R. APP. P. 33.1(a)(1) ("As a prerequisite to presenting a complaint for appellate review, the record must show that the complaint was made to the trial court by a timely request, objection, or motion . . . ."). And finally, by failing to object to Holloway's qualifications, CCC also waived that objection to his testimony. *See Nissan Motor Co. Ltd. v. Armstrong*, 145 S.W.3d 131, 143–44 (Tex. 2004) (where pretrial motion to exclude expert's testimony attacked reliability of opinions but not expert's qualifications, objecting party did not preserve complaints regarding qualifications for appeal).

## C.  Testimony of River's retained experts

Finally, CCC argues that the testimony of River's retained experts did not provide any evidence regarding the cause of the wall's failure. CCC's argument is contradicted by the record, at least with respect to Joseph Dreher, a civil and structural engineer. Dreher reviewed the calculations that River performed in designing the wall, concluding that the calculations were correct, including the calculations regarding the shear plates. Although Dreher did not explicitly attribute the wall's failure to the omission of the shear plates, he concluded that omitting them would result in "a problem with the walls." He further testified that the shear plates would have worked as specified, had they been included in the wall. Again, CCC did not object to any of Dreher's testimony.

\*  \*  \*

We conclude that Holloway and Dreher gave testimony sufficient to support the jury's finding that CCC's failure to install shear plates in the retaining wall in Warehouse A caused the wall to collapse. We therefore overrule CCC's challenges with respect to the sufficiency of the evidence of causation.

## III.  Damages

CCC argues that insufficient evidence supports the jury's damages awards. A jury has broad discretion to award damages within the range of evidence presented at trial. *See, e.g.*, *Powell Elec. Sys., Inc. v. Hewlett Packard Co.*, 356

S.W.3d 113, 126–27 (Tex. App.—Houston [1st Dist.] 2011, no pet.). "Evidence corresponding to the exact amount found by the trier of fact is not essential." *Id.* at 126. But the verdict must fall within the range of the evidence presented, and a jury may not "pull figures out of a hat" in assessing damages. *See First State Bank v. Keilman*, 851 S.W.2d 914, 931 (Tex. App.—Austin 1993, writ denied).

Among other things, CCC argues that the evidence is legally and factually insufficient to support the jury's assessment of damages for future repair costs. "A party seeking to recover remedial damages must prove that the damages sought are reasonable and necessary." *McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012) (citing *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 200 (Tex. 2004) (per curiam)). "[T]he plaintiff must show more than simply 'the nature of the injuries, the character of and need for the services rendered, and the amounts charged therefor.'" *Id.* (quoting *Dall. Ry. & Terminal Co. v. Gossett*, 294 S.W.2d 377, 383 (Tex. 1956)). The plaintiff need not use magic words such as "reasonable" or "necessary," but is only required to present sufficient evidence to support a finding that that the costs were reasonable and the repairs were necessary. *Ron Craft Chevrolet, Inc. v. Davis*, 836 S.W.2d 672, 677 (Tex. App.—El Paso 1992, writ denied); *Carrow v. Bayliner Marine Corp.*, 781 S.W.2d 691, 694 (Tex. App.—Austin 1990, no writ); *Liptak v. Pensabene*, 736 S.W.2d 953, 958 (Tex. App.—Tyler 1987, no writ). The plaintiff may not merely offer evidence of

17

how repair costs or estimates were derived, but must also adduce evidence that the costs were actually reasonable. *McGinty*, 372 S.W.3d at 627–28.

South Central relied upon the testimony of Peter James Arles to establish its future damages. CCC objected to Arles as unqualified to give his testimony, and it further argues that no other evidence supports the jury's assessment of future repair damages.[*] We review the admission of expert testimony under an abuse of discretion standard. *Whirlpool Corp. v. Camacho*, 298 S.W.3d 631, 638 (Tex. 2009). "If scientific, technical, or other specialized knowledge" would assist the jury, a witness who is qualified as an expert by "knowledge, skill, experience, training, or education" may testify as an expert. TEX. R. EVID. 702. Such an individual "may testify . . . in the form of an opinion or otherwise." *Id.* The

---

[*] CCC also argues that, although Arles testified as an expert witness, South Central improperly failed to designate him as an expert on damages. The record on this point is unclear. The arguments of counsel before Arles took the stand indicate that South Central designated Arles as an expert in engineering, but not on damages, and CCC objected to his testimony on the latter. During cross-examination, however, counsel for South Central objected, "Mr. Arles hasn't been designated as an expert in this case." If Arles was not properly designated, then the trial court could have excluded his testimony, and we would review its decision with respect to admissibility for an abuse of discretion. *See Ersek v. Davis & Davis, P.C.*, 69 S.W.3d 268, 274 (Tex. App.—Austin 2002, pet. denied); *Cruz v. Furniture Technicians of Hous., Inc.*, 949 S.W.2d 34, 35 (Tex. App.—San Antonio 1997, writ denied); TEX. R. CIV. P. 195.2; *see also* TEX. R. EVID. 705. Because our analysis leads to the same result as if we held that trial court should have excluded Arles's testimony as untimely designated, we assume without deciding that Arles was properly designated as an expert witness.

proponent of the witness's testimony bears the burden to show that the expert's testimony is relevant and rests on a "reliable foundation." *E.I. du Pont de Nemours & Co., Inc. v. Robinson*, 923 S.W.2d 549, 555 (Tex. 1995) (citing *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 597, 113 S. Ct. 2786, 2799 (1993)).

Arles, a structural engineer, works for BEI Engineers, an engineering consulting firm. He testified that BEI, on behalf of South Central, proposed various scenarios for repairing the retaining wall in Warehouse A, beyond the repairs initially made by CCC after the wall's collapse. Before and repeatedly during Arles's testimony, CCC objected that South Central had not established that Arles had personal knowledge of how BEI made its estimates of future repair costs. The trial court overruled CCC's objections and admitted both the testimony and documents reflecting BEI's estimates.

Arles testified on only one topic: South Central's options for future repairs to the warehouses, with a particular focus on two estimates prepared by BEI. One estimate for proposed repairs ran to $5.4 million, while the other was for $4 million. Arles testified that the proposed solutions were "workable," but clarified, "[h]ow feasible and cost-effective, you know, we never got that far." He stated that he assumed that the repairs were still possible at the time of trial, but qualified that statement, saying, "I'm not even exactly sure what we came up with at the time. But I would assume that, yeah, there's always a way."

More importantly, Arles had no direct involvement in cost estimates with respect to the repair options, other than providing "maybe the preliminary sketches" to BEI's estimator, along with a list of materials required for the work. When asked whether he was "at all familiar with any cost estimates that were done" for one of the proposed modifications, he responded that he was "pretty sure" that a cost estimate was done and that he was "sure" he had seen it, but that he was not familiar with it. With respect to the other proposed modification, he explained, "I really didn't pay attention to the detail, the price." He testified that he believed that BEI tried to base its estimates on prevailing costs in Harris County at the time and that his firm was familiar with those costs, but he did not testify about what those costs were, the sources from which they were derived, or how BEI determined that they were reasonable. He elaborated:

A.     Are you asking if we're familiar with the costs in Harris County
        or these costs that are reflected?

Q.     The costs coming up with—

A.     Yeah. I mean, I can't recall—you know, it looks like these were
        done—these weren't done in our estimating software at the
        time. That's why I thought I was just giving the data over to our
        estimator. But it looks like I used the spreadsheet to do these.

He did not explain what "spreadsheet" he used or how he used it, nor did he identify the nature or source of any underlying pricing information. He also did not

explain whether using the spreadsheet would result in different estimates from BEI's estimating software.

Both estimates had a margin of error of 30% in either direction, meaning that BEI's estimates of the total costs could have spanned a range from as little as $2.8 million to more than $7 million. Arles explained this by stressing repeatedly that the estimates were "real preliminary" and "conceptual," and BEI had not done any "detailed engineering or checking" or any feasibility studies, nor had it prepared detailed design drawings that would be necessary before actually performing any repairs.

Expert testimony is conclusory if there is no factual basis for it or if the basis offered does not, on its face, support the opinion. *City of San Antonio v. Pollock*, 284 S.W.3d 809, 817 (Tex. 2009). A court may also conclude that an expert's testimony is unreliable if there is too great an analytical gap between the data upon which the expert relies and the opinion offered. *Gammill v. Jack Williams Chevrolet, Inc.*, 972 S.W.2d 713, 727 (Tex. 1998) (citing *Gen. Elect. Co. v. Joiner*, 522 U.S. 136, 146, 118 S. Ct. 512, 519 (1997)). A party challenging expert testimony as premised on an unreliable methodology must make a timely objection to preserve error on appeal, but may bring a challenge that the expert's testimony is "conclusory or speculative and therefore non-probative on its face . . . even in the

absence of any objection to its admissibility." *Coastal Transp*, 136 S.W.3d at 233; *see also Mar. Overseas*, 971 S.W.2d at 410, 412.

Arles's testimony does not demonstrate that the estimated costs of BEI's proposed repairs were reasonable and necessary. *See McGinty*, 372 S.W.3d at 627. Arles demonstrated no familiarity with how the costs were derived. On the contrary, his testimony repeatedly reinforced that he lacked knowledge of the costs involved and he did not participate directly in estimating costs. Moreover, BEI did no assessment of whether the proposed repairs were feasible or cost-effective, and it had not performed enough of the engineering legwork to determine whether the repairs would be realistic.

In light of these facts, we hold that Arles's testimony with respect to future repair costs was conclusory. *Pollock*, 284 S.W.3d at 817. It is also unreliable, as too great an analytical gap exists between the data upon which Arles relied—technical calculations about the materials to be used in the proposed repairs—and the opinions he offered regarding repair costs. *Gammill*, 972 S.W.2d at 727; *see also Robinson*, 923 S.W.2d at 555. Because Arles's testimony on repair costs was conclusory and unreliable, it constitutes no evidence in support of the jury's award of future repair damages.

We further agree with CCC that the record contains no other competent evidence of the cost of reasonable and necessary future repairs. Indeed, South

Central relies entirely on Arles's testimony and the BEI estimates to support the jury's award on appeal. Because the evidence does not support the future repairs award, we sustain CCC's argument on this point.

Ordinarily, appellate courts render judgment when sustaining a no-evidence issue. *Guevara v. Ferrer*, 247 S.W.3d 662, 670 (Tex. 2007). However, if there is evidence to support some award of damages, rendition is inappropriate. *Id*. In that scenario, we must remand for a new trial, unless we can suggest a remittitur. *Id*.

In this case, the evidence at trial conclusively demonstrated that Warehouse A was damaged by the collapse of its retaining wall and that the retaining wall in each warehouse falls short of the capacity that South Central paid CCC to build. The evidence is also conclusive that repairing or rebuilding the walls will result in actual costs to South Central, even though there is no evidence of the reasonable and necessary amount of those costs. Thus, we cannot render a judgment for CCC, nor are we able to suggest a remittitur. We therefore must remand for a new trial. *Id.*

Because CCC disputes liability, and the costs of future repairs constitute unliquidated damages, we may not order a separate trial solely on those damages. TEX. R. APP. P. 44.1(b). Instead, we must remand for a new trial on both liability and damages. *Id.*; *Minn. Min. & Mfg. Co. v. Nishika Ltd.*, 953 S.W.2d 733, 740 (Tex. 1997). Further, CCC's remaining points on appeal all relate to other

measures of damages, and it is undisputed that South Central did or will incur each such type of damages. CCC argues only that the jury's damages awards are supported by legally and factually insufficient evidence. Because each of these issues, if sustained, would require us to remand for a new trial, we do not reach them.

## Conclusion

Because no evidence supports the jury's award of future repair damages, we reverse and remand for a new trial.


Michael Massengale
Justice

Panel consists of Justices Jennings, Bland, and Massengale.