# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

No. 16-11645

United States Court of Appeals
Fifth Circuit

**FILED**
February 15, 2018

Lyle W. Cayce
Clerk

BALFOUR BEATTY RAIL, INCORPORATED,

Plaintiff - Appellant

v.

KANSAS CITY SOUTHERN RAILWAY COMPANY,

Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas
USDC No. 3:10-CV-1629

Before DAVIS, HAYNES, and COSTA, Circuit Judges.

GREGG COSTA, Circuit Judge:*

The Kansas City Southern Railway Company (Southern) hired Balfour Beatty Rail, Inc. (Balfour) to complete a new railroad track in Texas. Southern contends that because of Balfour's poor workmanship, it was forced to pay for tens of thousands of tons of ballast in excess of what should have been required to finish the track. The district court determined after a bench trial that Balfour had breached its contract and Southern was entitled to

---

* Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 16-11645

several million dollars in compensatory damages for wasted materials. Except for a minor adjustment to the final amount awarded, we affirm the district court.

## I.

Southern originally hired Gulf Coast to construct 85 miles of new railroad track between Victoria and Rosenberg, Texas. After becoming dissatisfied with the quality and timeliness of the construction, Southern solicited a bid from Balfour to finish the remaining 65 miles of the track. Balfour submitted a bid and was awarded the contract. Southern agreed to pay Balfour a flat rate of $12.2 million and to purchase and deliver the necessary track materials such as welded rail and ballast. Ballast is crushed stone used to support the track and maintain a level height along potentially uneven terrain.

Problems arose that caused significant delays and overuse of materials. After the track was completed, Balfour sued Southern in Texas state court. Southern removed the case to federal court and counterclaimed. Following cross motions for summary judgment and a nine day bench trial, the district court decided that Balfour had wasted ballast in violation of its contractual obligations and awarded Southern $2,353,299.40 in compensatory damages for the cost of the material, $721,858.66 in prejudgment interest, and $1,069,934.33 in attorney's fees.[1]

This appeal concerns only Southern's successful counterclaim to recover the costs of wasted ballast. We must determine whether the evidence was sufficient to support the district court's ruling; whether the amount of ballast wasted was properly calculated; and whether Balfour is entitled to any

---

[1] The court awarded Balfour $47,561.43 for claims associated with four Change Orders, which was subtracted from Southern's ultimate award.

2

affirmative defenses. We detail only the evidence that relates to this challenged award.

The Master Agreement required Balfour's work to be (a) "in a workmanlike manner and . . . first class in execution and quality," and (b) "in accordance with the specifications referenced in the applicable Statement of Work." The Statement of Work called for at least ten inches of ballast under the railroad ties to lift the track to the proper elevation, with an acceptable variance of plus or minus two inches, and no more than twelve inches of shoulder on each side of the railroad ties. Balfour was obligated to exercise care "not to distribute ballast in excess of the amount required for the lift to be made."

As the project continued, Balfour began to request more and more ballast from Southern. At the beginning of construction, Southern delivered 1,750 tons of ballast per day. The demand for ballast eventually increased to 3,700 tons per day and then to 4,646 tons per day. To meet the higher demand for ballast, Southern obtained rock from quarries in Arkansas, Georgia, and Mexico. Because of the flat rate payment structure, every additional ton of ballast increased Southern's construction costs.

The court heard extensive testimony on how to calculate the amount of ballast "wasted." Ballast is wasted in one of two ways: (1) when too much rock is spread on the outside edges of the track, thus no longer providing structural support; or (2) when too much rock is placed in the center, thus raising the track unnecessarily high. The undisputed total amount of ballast delivered by Southern was 412,511 tons.[2] The amount wasted is this amount of rock delivered minus both the amount Balfour should have needed to complete the

---

[2] This amount of total ballast may actually underestimate the rock available to Balfour. Balfour had access to an undetermined amount of ballast in a stockpile already on site that was not included in the total amount when the district court did its calculations.

3

project and the amount diverted from Balfour to other contractors.   This difference represents how much Balfour used beyond what the project required, and that number can be multiplied by the average cost per ton to get the final calculation of damages.  The following formulas demonstrate this:

- Total Wasted Ballast (in tons) = Amount Delivered – (Amount Diverted + Amount Needed)

- Damages for Wasted Ballast = Total Wasted Ballast * KC Southern's Average Out-of-Pocket Cost per Ton

Balfour blamed the use of the additional ballast on the poor quality of the subgrade on which the track was built.  That land was flattened by a separate contractor.   Balfour raised this concern with Southern during construction and argues that because the height of the subgrade was too low in some places and too narrow in others, the additional ballast was necessary to get the track to the specifications required under the contract.  Southern counters that it had warned Balfour that it was using too much ballast and says it took this subgrade variation into account when calculating how much ballast should have been used.  Southern presented expert testimony that the subgrade was properly constructed and, regardless of height, ballast had been poured too far on the sides where it did not provide any structural support.

Southern's Director of Track Projects, Lee Peek, testified that Balfour wasted 74,260 tons of ballast.  Peek detailed how he reached this number.  He surveyed the track following the completion of the project and measured the top rail, the subgrade elevation, and the actual depth of ballast along the rail. He then explained how he calculated that the project should have needed only 327,591 tons of ballast.  Balfour argues that there are two other potential estimates of wasted ballast.  One, presented by Southern's expert witness David Brookings, was determined using a general rule of thumb of about one ton of ballast per foot of track; based on the length of the track, he estimated

about 349,000 tons of ballast would be required.  The second, a Balfour revised internal estimate, estimated 340,560 tons of ballast were needed to finish construction.  Both of these alternative estimates would result in Balfour owing less.

The district court credited Southern's evidence and concluded that it was Balfour's deficient workmanship, rather than any problem with the subgrade, that caused ballast to be wasted.  The court also determined that the project should have required 327,591 tons of ballast, that 10,660 tons of ballast were diverted to other contractors, and thus 74,260 tons had been wasted by Balfour.

The court then heard testimony concerning how much each ton of ballast cost.  Southern's Director of Accounting, Lynn Carnes, provided testimony about ballast's cost per ton.  Carnes testified that Southern paid $15.03 per ton on average for the raw material that was delivered to the construction site during the relevant time period.  Carnes also calculated that Southern paid an additional $7.76 per ton to transport the ballast to the construction site and $8.90 per ton to lease the rail cars.[3]  Carnes concluded that the average cost per ton of ballast was $31.69, that the number was out-of-pocket cost not including profit, and that the calculations conformed to "General Accounting Principles."  The district court accepted this testimony and used this cost in its damages calculation.  Multiplying this average cost per ton times the 74,260 tons of ballast it found was wasted, the district court concluded that Southern was entitled to $2,353,299.40 ($31.69 * 74,260) in compensatory damages.

## II.

Balfour challenges the district court's damages award on several grounds: (1) that the evidence is insufficient to sustain the award because

---

[3] A portion of the excess ballast did not require these additional locomotive and ballast car costs based on which quarry the rock came from; that difference was taken into account in the final calculation of per ton cost.

No. 16-11645

Southern failed to prove the reasonableness of the cost of supplying ballast; (2) that the district court miscalculated the amount of ballast wasted; (3) that the district court failed to credit Balfour for the total amount of ballast diverted to other contractors; and (4) that the "undifferentiated" damages model used by the district court failed to exclude from its calculations ballast that had not actually been wasted or ballast wasted because of the actions of a third party.

*Whether Southern Proved the Reasonableness of the Ballast Costs*

Balfour argues that Texas law requires Southern to prove the cost of the excess ballast was "reasonable," and that it failed to do so. The evidentiary reasonableness requirement arises in construction contract cases when the court is awarding remedial or cost-to-complete damages. *McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012) (per curiam); *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 200 (Tex. 2004). *McGinty* highlights that there are

> "two measures of damages for the breach of a construction contract: (1) remedial damages, which is the cost to complete or repair less the unpaid balance on the contract price, and (2) difference-in-value damages, which is the difference between the value of the building as constructed and its value had it been constructed according to the contract."

*McGinty,* 372 S.W.3d at 627. When a party is seeking to recover remedial damages that party "must prove that the damages sought are reasonable and necessary." *Id.*

The district court believed that this reasonableness requirement did not apply for the cost of the wasted ballast because the damages were expectation damages, not remedial, and thus not subject to the evidentiary requirements of *Mustang Pipeline. Balfour Beatty Rail, Inc. v. Kansas City S. Ry. Co.*, 173 F. Supp. 3d 363, 459 (N.D. Tex. 2016). We do not need to decide whether the unusual type of construction damages in this case—overuse of supplies the nonbreaching party was responsible for purchasing at ordinary levels—falls

6

outside of *Mustang Pipeline*.  Even assuming the reasonableness requirement applies, Southern presented sufficient evidence to establish it.  *See In re Am. Hous. Found.*, 544 F. App'x 516, 523 (5th Cir. 2013) (applying the rule that an appellate court may "affirm on any grounds in the record" to the appeal of a bench trial).

A party trying to prove reasonableness must introduce more than just the amount it paid for the extra costs.  *Mustang Pipeline*, 134 S.W.3d at 200–01 ("Evidence of the amounts charged and paid, standing alone, is no evidence that such payment was reasonable and necessary.").  That the party went out and purchased goods or services from a third party does not automatically establish that the price paid, even in an arms-length transaction, was reasonable.  But Southern was not required to produce a witness to say "magic words" such as "reasonable" or "necessary."  *CCC Grp., Inc. v. S. Cent. Cement, Ltd.*, 450 S.W.3d 191, 200 (Tex. App. 2014); *see also Prime Tree & Landscaping Servs. v. Americon Servs. Co.*, 2011 WL 947004, at *8 (Tex. App. Mar. 17, 2011).  And the reasonableness requirement is not rooted in abstract formalism.  The theme from the Texas cases is that the reasonableness requirement addresses the concern that a plaintiff, knowing the defendant will have to cover the costs after breach, will overpay when remedying damages.  *See generally Dickey v. Jackson*, 1 S.W.2d 577, 577 (Tex. Comm'n App. 1928) (discussing the origin of the reasonableness requirement in cases when the court assumed a jury had little common knowledge about the prices of "medicines and personal services").

The reasonableness of the ballast costs is supported by circumstances present in this case that were absent from the Texas cases cited by Balfour.  Most importantly, Southern is not just relying on the price it paid for the extra ballast for which Balfour is responsible.  It is also relying on the price it paid for ballast for which it was responsible.  Southern presented evidence that the

ballast was purchased and shipped based on a purchase order that it negotiated to cover the entire quantity for the project before any breach occurred.  This makes sense as there was not a separate order for "extra" ballast attributable to Balfour's breach.  The breach instead resulted in increased daily requests for ballast, the price of which was previously negotiated.  That is why there was so much debate at trial over how much ballast was wasted; the "extra" ballast was part of the same purchases as the expected ballast so it took a lot of after-the-fact analysis to separate the two. Southern thus had every incentive to negotiate the lowest possible price for the ballast because, without a breach, Southern would have been fully responsible for the entire cost.  The evidence shows a fixed price at each quarry, not the highly variable pricing one might see in other businesses. This generally accepted pricing structure is also true for much of the costs incurred transporting the ballast, such as railroad rates.  Reasonableness can thus be demonstrated by the general market prices Southern was paying for these expenses before it had any knowledge that some excess ballast costs would be passed on to Balfour via litigation.  *McGinty*, 372 S.W.3d at 628 (noting that in some cases the process of explaining how pricing figures were derived "will reveal factors that were considered to ensure the reasonableness of the ultimate price").  We reject the reasonableness challenge to the district court's award.

### *Calculating How Much Ballast Was Wasted*

We can dispose more readily of most of the remaining arguments because we largely agree with the thorough reasoning of the district court.  Balfour contends that the district court erred in its calculation of how much ballast was wasted (as opposed to the price of the ballast, which we just addressed). Balfour argues that the baseline amount for expected use should have been the amount Southern expected to use when the contract was signed rather than

the after-the-fact assessment of what amount would have been reasonable.[4] We disagree. Benefit-of-the-bargain damages are calculated by "the difference between the value as represented and the value received." *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 817 (Tex. 1997); *see also DaimlerChrysler Motors Co. v. Manuel*, 362 S.W.3d 160, 180 (Tex. App. 2012) (finding the calculation depends on an "expectancy theory"). The contract required Balfour to exercise care "not to distribute ballast in excess of the amount required for the lift to be made." Southern expected Balfour to do its job professionally and without waste; that was the expectation that was breached. The remedy thus should be calculated by subtracting how much ballast Balfour would have used had it performed in a "workmanlike manner" (what Southern expected) from the cost Southern ultimately had to pay (value received). Had the contract been properly performed, Balfour would have used the amount of rock estimated by the district court. We see no requirement for disregarding that amply supported factual finding and instead using an estimated amount listed in Southern's bid package.

### Amount of Ballast Diverted

The district court determined based on Balfour's daily reports and the testimony of Lee Peek that 10,660 tons of ballast were diverted to other contractors. Balfour contends that the court failed to include 16,000 additional tons of diverted ballast. But our review of the record reveals a finding of clear error only for 261 tons of diverted ballast from March 28, 2009.[5] This is an

---

[4] We note that Balfour's argument here that the court use expectation damages conflicts with its insistence above that this court use remedial damages, which are subject to *McGinty*'s reasonableness requirement.

[5] The court relied on the testimony of Lee Peek to make its diverted ballast calculation. Peek testified that he failed to count three cars when doing his calculation; this omission would result in an error of 261 tons of diverted ballast. The district court failed to include this additional diverted ballast in its final calculation

No. 16-11645

error Southern acknowledges.  The damages will be reduced to reflect this change.  But the other challenges Balfour makes to the diversion findings involve conflicting evidence within the province of the factfinder to resolve.

*Whether the District Court Used an Erroneous Damages Model*

In its final challenge to the damages award, Balfour contends that the court failed to isolate the ballast attributable to the breach so the damages awarded are too speculative.  Southern, however, presented technical testimony supporting its calculations.  Peek explained that ballast can be wasted two ways: by spreading the ballast out past where the regulator can bring it in and by raising the track too much.  The district court was entitled to credit this testimony and include both types of waste.  Peek's testimony also accounted for the subgrading done by other contractors to which Balfour tries to assign some blame.  Peek stated that his calculations were based on the "actual conditions of the project" and that he took into account the "actual elevation" when calculating how much ballast was "needed."  The district court sufficiently differentiated between wasted and properly used ballast.

\* \* \*

The only clear error we find in the damages calculation of wasted ballast is the 261 tons of diverted ballast that the district court failed to credit Balfour. The award is otherwise affirmed.

### III.

Balfour asserts that the affirmative defenses of waiver and quasi estoppel preclude Southern's recovery.  But the quasi estoppel claim fails because Balfour did not prove that Southern's wasted ballast claim is inconsistent with its previous position on wasted ballast or that allowing the claim to go forward would be unconscionable.  *See Steubner Realty 19, Ltd. v. Cravens Rd. 88, Ltd.*, 817 S.W.2d 160, 164 (Tex. App.—Houston [14th Dist.] 1991, no writ) (explaining the doctrine of quasi estoppel).

No. 16-11645

Balfour also does not establish that Southern waived its rights to seek a remedy for work not performed in a "workmanlike manner." Agreeing to supply the additional ballast at Balfour's request does not indicate that Southern "intentional[ly] relinquish[ed]" its right to enforce this guarantee. *Ulico Cas. Co. v. Allied Pilots Ass'n*, 262 S.W.3d 773, 778 (Tex. 2008). Southern was caught between hundreds of thousands of tons of rock and a hard place. It could have refused to ship additional ballast at Balfour's request, but that would have necessitated stopping the project, finding a new contractor, and resuming later, all of which likely would have cost substantially more than the damages awarded here. Southern had a duty to mitigate as much as possible. It did so by allowing Balfour to finish the project and then determining the extent of damages. The district court did not err in disregarding Balfour's waiver and estoppel arguments.

## IV.

Because we find that Southern was entitled to its damages for Balfour's breach of contract, it is also entitled to reasonable attorney's fees. *MBM Fin. Corp. v. Woodlands Operating Co.*, 292 S.W.3d 660, 666 (Tex. 2009). Although we did alter the ultimate award by 261 tons, or $8,271.09, this change represents less than one-half of one percent of the total damages and does not merit recalculation of attorney's fees. *Contrast Thomas v. Tex. Dep't of Criminal Justice*, 297 F.3d 361, 367, 373 (5th Cir. 2002) (vacating and remanding attorney's fees because it allowed plaintiff to choose between a nearly 20 percent reduction in damages or a new trial); *Williams v. Trader Publ'g Co.*, 218 F.3d 481, 488 (5th Cir. 2000) (vacating and remanding attorney's fees because it reduced the damages award by 40 percent).

\* \* \*

The judgment is AFFIRMED except for the reduction of wasted ballast from 74,260 tons to 73,999 tons, which changes the damages calculation by

No. 16-11645

$8,271.09.    The case is REMANDED for entry of an amended judgment (including recalculated interest) that reflects the reduction.