**Opinion issued August 29, 2025**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-21-00731-CV

———————————

**SHAFAII INVESTMENTS, LTD., RAJ SHAFAII, AND PARTY AND RECEPTION CENTER, INC., Appellants**

**V.**

**MELANIA ESTELA RIVERA BONILLA AND MARGARITA ANGELINO TRUJILLO, Appellees**

---

**On Appeal from the 113th District Court**
**Harris County, Texas**
**Trial Court Case No. 2018-07477**

---

## O P I N I O N

Two individual townhouse owners brought this consolidated suit against the seller for damages following flooding. Appellees Melania Estela Rivera Bonilla ("Rivera") and Margarita Angelino Trujillo ("Angelino") sued appellants Shafaii

Investments, Ltd., Raj Shafaii, and Party and Reception Center, Inc.,[1] (collectively, "appellants") asserting claims for breach of contract, fraud, negligent misrepresentation, and violations of the Texas Deceptive Trade Practices Act ("DTPA"). Rivera and Angelino alleged that appellants agreed to obtain insurance for their townhouses and charged them for insurance yet never procured insurance coverage.

In addition, Rivera sued appellants to stop the wrongful foreclosure of her townhouse.[2] She later sued for violations of the Texas Debt Collection Act ("TDCA"), alleging that appellants falsely threatened that she had committed a crime, collected unlawful fees and interest, and attempted to foreclose on her homestead without filing the requisite notice.

The jury found for Rivera and Angelino and assessed damages. The jury awarded them both damages for repair costs, mental anguish damages, treble damages under the DTPA, and attorney's fees. The trial court also issued a permanent injunction preventing appellants from further violating the Texas Debt Collection Act in dealings with Rivera.

---

[1]    The parties stipulated that Party and Reception Center Inc. is the general partner of Shafaii Investments.

[2]    Rivera also sued appellants' attorney Robert Kouts, who is not a party to this appeal.

On appeal, appellants challenge the legal and factual sufficiency of the evidence supporting the jury's award of repair damages, mental anguish damages, and attorney's fees. First, appellants argue that the evidence is insufficient to prove repair damages were necessary and reasonable. As part of this issue, appellants assert that the trial court erred in admitting certain evidence and that expert testimony was required to support the award of damages. Next, appellants contend that mental anguish damages and treble damages are precluded by the economic loss rule. Appellants also argue that the record does not support the existence of mental anguish or the amount of damages awarded. Finally, appellants argue that the evidence is insufficient to support the award of attorney's fees.

We affirm.

## Background

### A. Rivera's Townhouse

At trial, Rivera testified that she purchased her townhouse from Shafaii Investments in June 2014, with Shafaii Investments seller-financing the purchase. Rivera executed loan documents, including a real estate lien note and a deed of trust. When she bought her townhouse, Rivera did not have a credit history and earned between $10,000, and $12,000 a year. Rivera testified that although the deed of trust required her to obtain insurance, Raj Shafaii told her that she had to pay him directly for insurance and that he would obtain insurance for any damage to the inside or

outside of her property. She testified that Shafaii charged her $75 per month for insurance. When she asked if she could obtain insurance elsewhere, Shafaii told her she was not permitted to do so. Rivera testified that Shafaii instructed her that she would lose her home if she obtained insurance elsewhere.

Rivera testified that she paid monthly for insurance from 2014 until the October 2015 flood. Though Rivera asked Shafaii multiple times to review the insurance coverage paperwork, Shafaii never provided it to her. Instead, he told her not to worry about it because no matter what happened, her house would be covered by insurance. The jury viewed invoices and money order receipts demonstrating Rivera's payments for insurance.

In late October 2015, Rivera's townhouse flooded with two to three feet of water. The flooding damaged the first floor of the home, including the sheetrock, lower kitchen cabinets, doors, and insulation. Rivera testified that Raj Shafaii told her that the townhouse was insured and an inspector would assess the damage. She testified that Shafaii later told her that he had been inside her townhouse with an adjuster and that she would get "a lot of money from insurance." Rivera never received any money. After the flood, Shafaii told her that he would no longer accept her monthly insurance payments and that she should obtain her own insurance.

Rivera obtained three initial verbal estimates for repairing her townhouse after the 2015 flood. The estimates ranged from $30,000 to $75,000. She did not hire any

4

of the contractors because she thought their pricing was high and because she was waiting for insurance money from appellants. In the meantime, Erasco Martinez told her that he could make the repairs for $18,000 and gave her a written estimate. At the time, Rivera sold tacos in the neighborhood, and she knew Martinez as a customer who purchased tacos for his workers. Martinez showed Rivera photographs of other properties he had worked on. She thought the work looked professional, pretty, and clean, and she found his pricing fair. Rivera believed $18,000 was reasonable because Martinez had to remove and replace all the damage on the first floor. Rivera hired Martinez, and Martinez completed the work in six months. In addition, Martinez fixed a leaking roof and painted the outside and first floor of the townhouse. He also built a concrete patio in the front of the townhouse. Rivera testified that she did not know how much of the $18,000 was for any specific repair in her home and that she paid an additional $4,000 for extra work pursuant to a verbal agreement with the contractor for a total of $22,000. Rivera testified that she was not seeking to recover the additional $4,000 that she paid Martinez for the extra repairs.

Rivera's townhouse flooded again in 2017 during Hurricane Harvey. By this time, Rivera had obtained her own homeowner's insurance. The insurance estimate stated that the replacement cost after the hurricane was $33,537.43 with an actual cash value of $30,770.09 for repairs. Rivera received a check for $28,770.09 from

5

her insurance to repair her townhouse. Raj Shafaii asked Rivera to tell him when she received the insurance check so he could use it to fix her townhouse. Rivera was afraid that if she did so, Shafaii would keep the insurance money and not fix her home. She believed that in 2015, Shafaii took the insurance payout yet refused to repair her home, and she did not want that to happen again. The insurance check was payable to Rivera with Shafaii Investments listed on the check under Rivera's name. Rivera cashed the check and used the proceeds to pay Martinez a second time to repair her townhouse. She paid Martinez $29,000.

After Rivera refused to give the insurance check to Raj Shafaii, his attorney, Robert Kouts, sent her a notice of default on her loan, accusing her of forging an insurance check payable to Shafaii Investments. Shafaii authorized Kouts to set Rivera's townhouse for a February 2018 foreclosure sale. Shafaii accused Rivera of "illegally" forging or cashing "an insurance check for funds due to [Shafaii Investments]."

Rivera sued appellants to stop the February 2018 foreclosure sale. She obtained a temporary restraining order enjoining the sale. Notwithstanding, Shafaii authorized Kouts to issue a second notice of default and intent to foreclose that accused Rivera of "illegally" forging or cashing an insurance check for funds due to Shafaii Investments. Shafaii conceded at trial that Rivera had not forged his name, as alleged. Kouts agreed that Rivera's negotiation of the check was "technically

6

legal" and conceded that when he accused Rivera of illegally forging the check, he had not seen the back of the check.

In March 2018, Kouts, on behalf of Shafaii Investments, issued two separate notices of default and intent to foreclose, accusing Rivera of cashing the insurance check illegally. The notices also claimed that Rivera lacked insurance and failed to pay property taxes and homeowner's association assessments. Kouts never filed notices of acceleration of the note and sale of property as required in foreclosure proceedings.

Rivera paid her property taxes and obtained insurance in April 2018. She provided proof to appellants. Shafaii Investments refused to stop the May 2018 foreclosure sale, but Rivera obtained an injunction to stop the foreclosure.

Rivera testified that she was "irreparably" affected by her interactions with Shafaii. She stated that she was "very afraid" Shafaii would press charges or call the police after she received Kouts's letter falsely accusing her of forging or illegally cashing the insurance check. She said that her children cried because they saw her sad, stressed, and worried. She testified that she lost sleep and became chronically depressed and overwhelmed with anxiety. She testified she was "being treated for anxiety and depression" and that "she was taking medication every week for treating [her] anxiety and [] depression." She stated that she had panic attacks and that she was on a waitlist for further treatment for anxiety and depression.

7

Rivera testified that she is "very afraid" that Shafaii will "come after" her because she filed suit against him. She testified that she worries Shafaii will retaliate and hurt her children. The day after she gave a deposition in the case, she called an ambulance because she was so stressed she could not breathe. Rivera testified that she had not seen a psychologist because hiring a psychologist is very expensive. She testified that taking her children to a psychologist would cost between $250 and $270 per child or about $800 for her family, and she did not have the money. She testified that if she had the $4,500 she had deposited into the court's registry as part of the suit, she would be able to obtain psychological help for herself and for her children. Rivera said she was suing for mental anguish damages so that she would have money to use for psychological treatment for herself and her children.

## B. Angelino's Townhouse

Angelino purchased her townhouse in January 2017 from Shafaii Investments, which seller-financed the purchase. At the time, Angelino worked at a car wash, and she earned $10,000 to $12,000 annually. Angelino paid three bills monthly to appellants: (1) $881.60 toward the mortgage, (2) $135 in homeowner's association dues, and (3) $80 for insurance. Angelino testified that Raj Shafaii told her she had to pay him directly for insurance and that he had secured insurance for the whole property, covering all the townhouses. After Hurricane Harvey, Shafaii refused to accept Angelino's insurance payments.

Angelino's townhouse flooded during Hurricane Harvey, taking on about four feet of water. Angelino evacuated as floodwaters rose. She and her children spent the night in a park before the Red Cross took them to a shelter. They stayed in the shelter for weeks. She testified that when she returned home, her first-floor belongings were destroyed, and the townhouse smelled awful.

Angelino testified that she believed appellants had insured her townhouse, and that insurance would pay to repair the flood damage. Instead, Raj Shafaii told her there was no insurance and threatened that if she did not fix the townhouse, he would "throw" her in jail and she would have to pay for the townhouse "penny after penny" anyway. Later, Angelino returned home to find Shafaii and other "well-dressed" people in her townhouse taking pictures. Shafaii told her that the people were real estate agents from an insurance company and that he was going to take care of the damage. Another time, someone called Angelino to alert her that Shafaii was going in her townhouse. Angelino came home and found Shafaii and other people taking pictures. She testified that they took pictures of her television, her living room, and her appliances. Angelino did not understand why or how Shafaii had a key to her townhouse to allow the individuals inside to take pictures. She never received any insurance money for the flood damage.

Regarding Angelino's townhouse, Raj Shafaii testified that he did not provide insurance for the townhouse and denied that he received money orders for insurance

9

from Angelino. The money orders with monthly insurance payments were admitted into evidence. When confronted with his deposition testimony that he paid for insurance and allowed Angelino and Rivera to pay him back, Shafaii responded that in his deposition, he had been referring to another owner, Angelino's sister.

Angelino used savings and a loan from family members to fix her townhouse. She consulted three contractors who were in the community fixing other townhouses and received verbal quotes from each ranging between $25,000 and $35,000. She approached a fourth contractor, Ruben Castillo, because she saw him working on other townhouses in the area and thought his work was good. Castillo initially quoted Angelino $35,000 to complete the job, but when Angelino rejected the quote, he lowered the price to $25,000, including materials, provided she hired him to start right away. Angelino thought this amount was reasonable, especially because Castillo would pay for the materials, and Castillo repaired Angelino's home in two months. The court admitted into evidence receipts showing Angelino's payments to Castillo.

Angelino testified that when she closed on her townhouse, she asked Shafaii if she could first review the documents at home. He refused and told her that she had to effectuate the closing at the specified time with his lawyer. Angelino testified that she later learned Shafaii had recorded her at the closing without her permission. She testified that she went to the restroom and "she does not know what [Shafaii] did

when [she] was in the restroom." She does not "know if he recorded her when [she] was in the restroom" and that is "something that's been on [her] mind all this time." She testified that since she's been involved in litigation with appellants and learned that Raj Shafaii recorded her, failed to get insurance after she paid him for it, and told her she would go to jail if she did not fix her townhouse, she has been so worried that she cannot sleep or eat. She testified that dealing with appellants left her feeling "very badly" and unwell, and she could not sleep or eat because she was under "so much stress." She believed she failed her children because they did not have a home. She worried that Shafaii had installed cameras or microphones in her house, especially because she knows he has a key. Angelino testified that her loan with appellants continues until 2027, and she is afraid of having to deal with Shafaii for six more years.

## C.    The Jury's Verdict

As to Rivera, the jury found that Shafaii Investments had agreed to insure or obtain insurance for Rivera's property, and Shafaii Investments breached the agreement. It also found that Shafaii Investments and Raj Shafaii committed common-law fraud and statutory fraud in dealing with Rivera and knowingly violated the DTPA by engaging in unconscionable action and engaging in false, misleading, or deceptive acts that caused Rivera damages. Further, the jury found that Shafaii Investments, Raj Shafaii, and Robert Kouts engaged in unfair debt

11

collection in dealing with Rivera and knowingly violated the TDCA by using threats, coercion, or attempts to coerce her and by using fraudulent, deceptive, or misleading representations. The jury awarded Rivera $14,000 in cost of repair damages to replace her property following the 2015 flood, $30,500 in mental anguish damages, and $21,000 in treble damages for knowingly violating the DTPA and TDCA.

As to Angelino, the jury found that Shafaii Investments agreed to insure or obtain insurance for her property and breached the agreement. It further found that Shafaii Investments and Raj Shafaii made a negligent misrepresentation on which Angelino justifiably relied, committed common-law fraud and statutory fraud in dealing with Angelino, and knowingly violated the DTPA by engaging in unconscionable action and engaging in false, misleading, or deceptive acts that caused Angelino damages. The jury found that Shafaii Investments and Raj Shafaii also knowingly violated the TDCA by using unfair or unconscionable means of collecting debt. The jury awarded Angelino $20,000 in cost of repair damages from the 2017 flood, $39,500 for mental anguish damages caused by Raj Shafaii and Shafaii Investments, and $21,000 in treble damages for the DPTA violation.

The jury also awarded Rivera and Angelino attorney's fees for trial and conditional attorney's fees for appellate proceedings. The trial court issued a permanent injunction restraining appellants from foreclosing on Rivera's property for any default occurring before June 2, 2021, and from falsely accusing Rivera of

12

fraud or any other crime in connection with the 2017 insurance check for $28,770.09. This appeal followed.

On appeal, appellants do not contest liability. Instead, they argue that the evidence is insufficient to support the awards for repair damages, mental anguish, and attorney's fees. We address each in turn.

## Standard of Review

When a party challenges the legal sufficiency of the evidence to support an adverse finding on which it did not have the burden of proof, the party must demonstrate that no evidence supports the finding. *Graham Cent. Station, Inc. v. Peña*, 442 S.W.3d 261, 263 (Tex. 2014) (per curiam). In determining whether the evidence is legally sufficient to support the challenged finding, we review the evidence in the light most favorable to the finding. *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). We must credit favorable evidence if a reasonable factfinder could and disregard contrary evidence unless a reasonable factfinder could not. *Id.* Anything more than a scintilla of evidence is legally sufficient to support the challenged finding. *Formosa Plastics Corp. USA v. Presidio Eng'rs & Contractors, Inc.*, 960 S.W.2d 41, 48 (Tex. 1998).

When a party attacks the factual sufficiency of the evidence pertaining to a finding on which it did not have the burden of proof, we may set aside the finding only if, after considering all the evidence, it is so contrary to the overwhelming

13

weight of the evidence as to be clearly wrong and unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986) (per curiam); *Shepherd v. MWS Acquisitions, LLC*, No. 01-22-00293-CV, 2023 WL 2576451, at *3 (Tex. App.—Houston [1st Dist.] Mar. 21, 2023, no pet.) (mem. op.). The amount of evidence necessary to affirm a judgment is far less than the amount necessary to reverse. *Harris Cnty v. Coats*, 607 S.W.3d 359, 381 (Tex. App.—Houston [14th Dist.] 2020, no pet.). When conducting a factual sufficiency review, a court of appeals must not merely substitute its judgment for that of the factfinder. *Golden Eagle Archery, Inc. v. Jackson*, 166 S.W.3d 757, 761 (Tex. 2003).

We apply these standards mindful that the jury is the sole judge of witness credibility and the weight afforded witness testimony, and the jury may choose to believe one witness and to disbelieve another. *City of Keller*, 168 S.W.3d at 819; *Golden Eagle Archery*, 116 S.W.3d at 761.

### Remedial Damages

Appellants contend that the evidence is legally and factually insufficient to support the jury's award of repair or remedial damages to Rivera and Angelino. Specifically, appellants argue that the evidence was insufficient because neither townhouse owner proved that the repairs were necessary and reasonable and because the jury's awards have no basis in the record. Appellants argue that expert testimony is required to establish that repairs are necessary and reasonable, and that each

14

appellee's lay testimony lacked foundation and was conclusory. Appellants also argue that the court erred in admitting Angelino's and Rivera's testimony concerning the estimates they obtained from contractors and the written construction agreements for the repairs because the testimony and contracts are hearsay.

We hold that appellants did not preserve their complaint that the trial court erroneously admitted testimony of estimates from contractors and that any error in the admission of the written construction agreements was harmless. We further hold that expert testimony was not required and that the evidence was legally and factually sufficient to prove that the repairs were necessary and the costs reasonable.

## A. Applicable Law

"A party seeking to recover remedial damages [such as costs of repair] must prove that the damages sought are reasonable and necessary." *McGinty v. Hennen*, 372 S.W.3d 625, 627 (Tex. 2012) (per curiam) (citing *Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 200 (Tex. 2004) (per curiam)). "The plaintiff need not use magic words such as 'reasonable' or 'necessary,' but is only required to present sufficient evidence to support a finding that . . . the costs were reasonable and the repairs were necessary." *CCC Grp., Inc. v. S. Cent. Cement, Ltd.*, 450 S.W.3d 191, 200 (Tex. App.—Houston [1st Dist.] 2014, no pet.). "To establish that, the plaintiff must show more than simply 'the nature of the injuries, the character of and need for the services rendered, and the amounts charged therefor.'" *McGinty*, 372

15

S.W.3d at 627 (quoting *Dallas Ry. & Terminal Co. v. Gossett*, 294 S.W.2d 377, 383 (1956)). In other words, the plaintiff needs more than a list of itemized costs—the plaintiff needs to offer evidence of why these costs are reasonable. *See id.*

"[M]ere proof of amounts charged or paid does not raise an issue of reasonableness and such amounts ordinarily cannot be recovered without evidence showing the charges were reasonable." *Fort Worth Hotel Ltd. P'Ship v. Enserch Corp.*, 977 S.W.2d 746, 762–63 (Tex. App.—Fort Worth 1998, no pet.) (concluding hotel owner's evidence failed to justify jury's finding that hotel repair costs after explosion were reasonable and repairs necessary). "[E]xpert testimony about estimates for repairs, testimony of the person making the estimates or performing the repairs, or approval of the repairs by a third party," however "has been held sufficient to support an award of damages based on the cost of repairs." *City of Alton v. Sharyland Water Supply Corp.*, 402 S.W.3d 867, 876 (Tex. App.—Corpus Christi-Edinburg 2013, pet. denied).

**B.      Admission of Evidence**

We first consider appellants' evidentiary arguments. Appellants argue that the trial court abused its discretion by admitting certain evidence because it was hearsay. The admission and exclusion of evidence is committed to the trial court's sound discretion. *U-Haul Int'l, Inc. v. Waldrip*, 380 S.W.3d 118, 132 (Tex. 2012). The test for abuse of discretion is whether the trial court acted without reference to any

16

guiding rules and principles. *Id.* Even if the trial court abused its discretion in admitting certain evidence, reversal is appropriate only if the error was harmful, that is, it probably resulted in an improper judgment. *Id.* (citing TEX. R. APP. P. 44.1).

We first address Rivera's and Angelino's testimony concerning the estimates, then we address the contracts. Appellants argue that the trial court abused its discretion in admitting testimony from each homeowner as to verbal estimates each received from various contractors because the verbal estimates are hearsay. Angelino and Rivera contend that the objection was not preserved for our review. We agree.

### 1. Rivera's estimates

When Rivera was asked to describe how she selected a contractor, she responded that she first called contractors to ask how much they would charge to repair flood damages to her townhouse, noting there was damage to the walls, cabinets, and living room. She testified, "[T]he first [contractor] told me that he was going to charge me $75,000. Then the next one told me they were going to charge me $35,000. Then somebody, somebody who worked at the property told me they were going to charge me $30,000. Then I spoke to a gentleman called Ernesto Martinez, who told me that he was going to . . ." At that point, appellants' counsel interjected to lodge a hearsay objection and moved to strike Rivera's testimony as

to what people told her. The court sustained the objection but did not instruct the jury to disregard the objectional evidence.

"To preserve error *after* inadmissible evidence is allowed before the jury, a party must sequentially pursue an adverse ruling from the trial court by: (1) objecting to the complained-of evidence, (2) moving the court to strike the evidence from the record, (3) requesting the court to instruct the jury to disregard the evidence, and (4) moving for a mistrial. Absent an adverse ruling from the trial court, nothing is preserved for appellate review." *One Call Sys., Inc. v. Houston Lighting & Power*, 936 S.W.2d 673, 677 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (emphasis in original) (internal citation omitted); TEX. R. APP. P. 33.1. While the trial court sustained Shafaii's objection, Shafaii did not request an instruction from the court instructing the jury to disregard the evidence. The issue was thus not preserved for our review. [3]

### 2.    Angelino's estimates

Before Angelino testified, the lawyers approached the bench to discuss evidentiary issues related to Angelino's testimony. Appellants' lawyer told the court

---

[3]    Rivera went on to testify that she received oral estimates from Ramirez, Rojas, and an unnamed third contractor before agreeing to the price quoted by Martinez. Appellants lodged hearsay objections to testimony concerning the estimates offered individually by Ramirez and Rojas. Even assuming the admission of this testimony was erroneous, it would be harmless because substantially similar testimony was already in the record before the jury. Further, appellants did not object when Rivera testified that the third unnamed contractor estimated $30,000 to replace the first floor.

18

that he understood Angelino would testify that (1) she obtained verbal bids from a few contractors and a signed bid, (2) Plaintiff's Exhibit 36 reflected payments she made for repairs, and (3) she kept a copy of the payments as a record of regularly conducted activity. Appellants' counsel stated:

> We object to foundation, that [Angelino is] not an expert, and [she] does not have the qualifications to . . . state that these are reasonable and necessary charges. And it's also not a record of regularly conducted activity such to qualify under the hearsay rule. And it's hearsay within hearsay. So we object for all those bases.

The court overruled the objection and Plaintiff's Exhibit 36 was admitted.

Moments later, Angelino testified without objection that she obtained three bids to repair her townhouse following Hurricane Harvey. She stated:

> The first person that I met told me that he would charge me $35,000. The second person that I talked to, he told me that he could, that he would be able to charge me $30,000. And the third person charged me $25,000. And that's the bid that I chose because loans for construction and for homes are very expensive.

Angelino also explained what repair work these contractors' estimates encompassed. Appellants did not object to this testimony.

While the proffer appellants made before Angelino testified mentioned both the estimates from other contractors and the contract for the eventual repairs (Plaintiff's Exhibit 36), appellants' actual objections were that (1) Angelino's expected testimony about the necessity and reasonableness of the repairs would lack foundation because she is not an expert; and (2) Plaintiff's Exhibit 36 was hearsay

19

within hearsay and not a record of regularly conducted business. Appellants did not object to other testimony as hearsay. The court overruled the stated objection and admitted Plaintiff's Exhibit 36. Appellants did not later obtain a ruling when Angelino testified about the other estimates. Appellants also did not object when Angelino testified about the amounts offered by various contractors, and thus, appellants did not notify the trial court that they were objecting to that specific testimony on hearsay grounds. We agree with Angelino that by failing to object in the trial court during her testimony, appellants did not preserve this complaint for our review. TEX. R. APP. P. 33.1(a). The testimony from Angelino about the range of estimates she received was admitted into evidence, and the jury was entitled to consider it for all purposes.

### 3. Contracts and receipts

Appellants also argue that the trial court abused its discretion in admitting the repair contracts from the contractors Rivera and Angelino chose and the receipts for payment to each contractor because they were hearsay.

Appellants assert that the trial court abused its discretion in admitting the contracts because they are handwritten statements, opining what repair work was necessary, that were offered for the truth of the matter asserted. *See* TEX. R. EVID. 801(d). Appellants also argue that the payment receipts do not meet the business records exception to hearsay because neither Rivera nor Angelino had a regular

20

practice of keeping receipts for home renovations after a flood. Rivera and Angelino respond that the payment receipts are admissible to prove operative facts of what Rivera and Angelino actually paid for repairs. They argue that the signed agreements with their respective contractors are not hearsay—they are evidence of offer, acceptance, and the terms of the contract. Rivera and Angelino contend that even if the written contracts were hearsay, they were properly admitted under the business record exception to hearsay because both women testified to their customary practice of saving all receipts and documents related to expenses for their homes.

We need not resolve this issue because, even if the contracts and payment receipts were improperly admitted, such error was harmless. Rivera and Angelino testified about the scope of damages to their homes, the repair work the contractors performed, and the amounts paid to the contractors. Even though the contracts provided more specific itemizations of the work performed, given Rivera's and Angelino's testimony regarding the repairs and payments, we cannot conclude that admission of the documents probably caused the rendition of an improper judgment. *See JLG Trucking, LLC v. Garza*, 466 S.W.3d 157, 165 (Tex. 2015) (citing TEX. R. APP. P. 44.1(a)).

## C. Expert Testimony

Appellants next argue that the evidence supporting repair damages is insufficient because the necessity of performing major flood-related repairs and the

reasonableness of such repairs are matters of specialized and technical nature requiring expert testimony. We disagree.

Although expert testimony is one way to establish the reasonableness and necessity of repairs, expert testimony is required only when an issue involves matters beyond jurors' common understanding. *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 583 (Tex. 2006). Whether expert testimony is necessary to prove a matter or theory is a question of law we review de novo. *Id.* The Texas Supreme Court has held that the "subject of house repairs" is not "one for experts or skilled witnesses alone." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex. 1986) (stating trier of fact has discretion to evaluate opinion testimony on damages and upholding trier of fact awarding less damages than indicated by evidence).[4]

---

[4]   *See also Hands of Healing Residential Treatment Ctr., Inc. v. Havenar*, No. 01-13-01064-CV 2015 WL 4760211, at *7 (Tex. App.—Houston [1st Dist.] Aug. 13, 2015, no pet.) (mem. op.) (holding tenant's testimony regarding repairs, photographs of repairs, and insurance adjuster's testimony of extent of damage was enough lay testimony to establish tenant breached lease by failing to make necessary repairs); *U.S. Fire Ins. Co. v. Lynd Co.*, 399 S.W.3d 206, 217 (Tex. App.—San Antonio 2012, pet. denied) (noting scope of property damage may constitute matter of "personal observation and common sense" within scope of lay testimony). *But see Pjectrovic v. Home Depot*, 411 S.W.3d 639, 649 (Tex. App.—Texarkana 2013, no pet.) (holding homeowner could not give lay opinion testimony concerning necessity and reasonableness of whole house renovation); *Wortham Bros., Inc. v. Haffner*, 347 S.W.3d 356, 361 (Tex. App.—Eastland 2011, no pet.) (holding necessity and reasonableness of roof repair required expert testimony).

No bright-line rule requires that expert testimony must support every award of remedial damages for home repairs.[5] In relation to causation evidence in insurance coverage cases, for example, the Texas Supreme Court has considered lay testimony sufficient to support a finding of a causal relationship between a natural disaster and property damage.[6] In this case, where there was no dispute as to causation, the jury could ascertain from lay testimony, as a matter of personal observation and common sense, that a flood created the need for the home repairs. Similarly, there is nothing in the record to indicate that the cost associated with repairing the flood-damaged

---

[5]     *See Stevens v. Avent*, No. 07-20-00265-CV 2022 WL 393576 (Tex. App.—Amarillo Feb. 9, 2022, no pet.) (mem. op.) (declining to establish a "bright-line rule that expert testimony is required to support award of remedial damages" and concluding that non-expert testimony and exhibits were sufficient to support award that home repair costs were necessary and reasonable); *Seasha Pools, Inc. v. Hardister*, 391 S.W.3d 635, 641 n.8 (Tex. App.—Austin 2012, no pet.) (concluding expert testimony not required to establish cost to repair plaintiff's pool because "[t]here is nothing in the record to indicate that the cost associated with replastering a pool is so technical or complex that it required expert testimony"); *accord Pools Unlimited, Inc. v. Houchens*, No. 03-21-00046-CV, 2022 WL 16824340, at *9 (Tex. App.—Austin Nov. 9, 2022, no pet.) (mem. op.) (concluding reasonableness of pool repairs not so specialized or technical to require expert testimony).

[6]     *See Lyons v. Millers Cas. Ins. Co. of Tex.*, 866 S.W.2d 597, 598, 600–01 (Tex. 1993) (lay testimony from property owner and neighbors that brick veneer and outside staircase of home were undamaged before but visibly damaged after windstorm, along with engineer's opinion that windstorm caused damage, supported jury's finding that property damage was caused in part by wind and therefore covered by insurance); *U.S. Fidelity & Guar. Co. v. Morgan*, 399 S.W.2d 537, 540 (Tex. 1966) (lay testimony that warehouse was destroyed by wind before rising water was sufficient to support jury finding that property was damaged by wind, a covered event, rather than high water, an excluded event, under insurance policy).

townhouses was so technical or complex as to require expert testimony.[7] Under the facts of this case, expert testimony was not required to establish necessity and reasonableness of remedial damages.

## D.     Lay Testimony

Although lay testimony *could* establish reasonableness and necessity, we now evaluate whether it *did.* We turn to whether the lay testimony offered at trial was sufficient for the factfinder to conclude that remedial damages were necessary and reasonable.

### 1.      Necessity of Repairs

As to the necessity of repairs, Rivera testified that her townhouse took on two or three feet of water during the 2015 flood. She stated that the damage required installation of new sheetrock, replacing the front door and interior doors and lower kitchen cabinets, as well as replacing the undamaged upper kitchen cabinets so that her upper and lower cabinets would match.

Appellants did not dispute the necessity of the repairs. Shafaii testified that Rivera "probably got flooded" in 2015 and that if her house took on a foot of water, Rivera would need to repair it. He admitted that if the townhouse took on a foot of

---

[7]     *Compare U.S. Fire Ins. Co.*, 399 S.W.3d at 217 (stating whether hail fell on specific day at particular location and caused damage is not matter solely within scope of expert's knowledge), *with Wortham Bros., Inc.*, 347 S.W.3d at 361 (necessity and reasonableness of roof repairs required expert testimony).

water, sheetrock, insulation, bottom cabinets, and baseboards would need to be replaced. The jury viewed photographs of Rivera's townhouse showing the damage after the 2015 flood.

As to Angelino, appellants likewise admitted the necessity of repairs. Shafaii testified that everyone "including Angelino and [Rivera]" flooded during the hurricane. Angelino testified that four feet of water, up to her shoulders, came into the house. She left with her children to sleep in a park for a few days, then went to a shelter for three weeks while waiting for the waters to recede. When she returned to her townhouse, all her furniture and belongings on the first floor were damaged. The jury viewed photographs of flooding in the complex showing water rising almost a first-story high, people in kayaks in the parking lot, and individuals wading through waist-to-shoulder-deep water.

Viewing the evidence in the light most favorable to the verdict, we conclude that more than a scintilla of evidence existed to support the jury's findings that repairs to each townhouse were necessary. Appellants presented no conflicting evidence, and this finding was not so contrary to the overwhelming weight of the evidence to be unjust and wrong. The evidence was legally and factually sufficient to support the jury's finding that the repairs to each townhouse were necessary.

## 2.	Reasonableness of Repair Costs

We next turn to whether the evidence was sufficient to support the reasonableness of the costs to repair each townhouse. The jury was asked to determine the "reasonable and necessary cost to repair or replace [Rivera]'s real property following the 2015 flood" and the "reasonable and necessary cost to repair or replace Angelino's real property following the 2017 flood." Under our standard of review, if the record contains more than a scintilla of evidence showing that remedial damages of $14,000 to Rivera and $20,000 to Angelino were reasonable amounts, then the evidence is legally sufficient to support a determination that those amounts are reasonable. If that determination is not so contrary to the weight of the evidence as to be unjust, the evidence is factually sufficient to support the awards.

Appellants assert that each townhouse owner testified as to what she paid for repairs and that mere cost of repairs is insufficient to establish reasonableness. Evidence of amounts charged or paid, by itself, is not legally sufficient evidence to prove reasonableness; instead, separate evidence must be offered to show the reasonableness of expenses or costs. *See Mustang Pipeline*, 134 S.W.3d at 200–01 (holding expert who estimated cost to build new pipeline did not establish reasonableness of charges); *Gossett*, 294 S.W.2d at 382–83. But the Supreme Court has concluded that in some cases, the process of determining repair costs "will reveal

factors that were considered to ensure reasonableness of the ultimate price." *McGinty*, 372 S.W.3d at 627.

We examine whether each townhouse owner considered such additional "factors" to ensure the reasonableness of the ultimate price paid. *Id.* at 628. In *McGinty* and *Mustang Pipeline*, each expert testified to a single estimated number for the cost of repairs. *See McGinty*, 372 S.W.3d at 629; *see also Mustang Pipeline*, 134 S.W.3d at 201. Here, Rivera and Angelino did more than offer proof of just the cost of repairs they incurred; they each testified to the multiple estimates they received from various contractors, the process by which they selected a contractor, and how they determined that the contractor's pricing, and thus, the cost of repairs under the circumstances, was reasonable.

Rivera testified that she first obtained estimates from three separate contractors ranging between $30,000 and $75,000 to repair her flood-damaged townhouse. She specifically asked each contractor how much he would charge to repair the damage caused to her house by the flood. She did not hire any of the contractors who provided those estimates because she thought their pricing was too high. Rivera ultimately hired Erasco Martinez—the fourth contractor to whom she spoke. Martinez is a customer at Rivera's taco stand who did repair and construction work on other townhouses in Rivera's neighborhood. Martinez showed Rivera photographs of properties he had repaired, and he quoted her $18,000 to repair her

townhouse—an amount much lower than the other quotes she received. Rivera believed his price was fair and reasonable for the scope of the work. She needed her home repaired promptly for the safety of her children, so she paid Martinez $18,000.

Angelino similarly testified that she received quotes from three separate contractors to repair her townhouse following Hurricane Harvey. The quotes ranged between $25,000 and $35,000, and Angelino explained the scope of repair work covered by the quotes. Each of the three contractors who provided the quote had repaired other townhouses in the community. Angelino thought the quotes were high, but she also knew demand was high after the hurricane. She ultimately talked to Ruben Castillo, who had done work in the community. Angelino saw his work in a neighboring townhouse and thought it was good. She hired him and agreed to pay him $25,000 for the work, including materials. Angelino testified that she needed her townhouse repaired promptly so that her children had shelter, and Castillo told her he could start right away. She thought what Castillo charged was fair and reasonable under the circumstances.

Appellants focus on the fact that each homeowner testified that she did not know much about construction or how to fix houses. Specifically, when asked if she knew the individual line-item cost of any aspect of the repairs to her townhouse, Rivera responded that she relied on her contractor because she is not a contractor and does not fix houses. Similarly, Angelino testified that she "does not know about

28

construction" when asked if the prices charged by Castillo were fair. She then clarified that considering what the other contractors were charging, and the fact that Castillo was covering the cost of materials, she thought the price he charged was reasonable. Appellants argue that because each homeowner testified that she was unfamiliar with construction pricing, the evidence is insufficient to support that the repair costs were reasonable. In *Gerhart*, our court held that a plaintiff's testimony, including reliance on multiple estimates for each repair job, was sufficient to award reasonable repair costs. *Great Am. Homebuilders Inc. v. Gerhart*, 708 S.W.2d 8, 12 (Tex. App.—Houston [1st Dist.] 1986, writ ref'd n.r.e.) (holding sufficient evidence that repair costs were reasonable when plaintiff-appellee testified that she obtained multiple estimates for each of three repair jobs and used same plumber that appellants used to install hot water heater); *see also Demiraj v. Martinez*, No. 01-23-00493-CV, 2025 WL 626430, at *7–8 (Tex. App.—Houston [1st Dist.] Feb. 27, 2025, no pet.), *modified and supplemented by* No. 01-23-00493-CV, 2025 WL 863775 (Tex. App.—Houston [1st Dist.] Mar. 20, 2025) (mem. op.) (evidence that contractor charged amount consistent with multiple other contractors' estimates to complete repair job and that amount was in line with cost of work not completed by initial contractor was more than scintilla of evidence to demonstrate amount paid was reasonable). Similarly, in *Gupta*, the San Antonio Court of Appeals held that evidence of repair damages was reasonable when the plaintiff "presented receipts

29

displaying the cost of the repair materials," "met with various contractors," "determined what a reasonable cost would be to repair their building," and "enlisted the help of both the contractor and handyman to complete the repairs." *Gupta v. Manwani*, No. 04-03-00152-CV, 2004 WL 2097514, at *3 (Tex. App.—San Antonio Sept. 22, 2004, no pet.) (mem. op.) In *Gupta*, as here, neither the contractor nor handyman testified at trial. *Id*. The court of appeals nonetheless determined that the plaintiff's "testimony about his reliance on the contractor's advice about repair work [was] enough to establish that he was knowledgeable about the costs of repairs." *Id.*; *see also SAS & Assocs., Inc. v. Home Mktg. Servicing, Inc.*, 168 S.W.3d 296, 302 (Tex. App.—Dallas 2005, pet. denied) (holding trial court did not err in admitting lay witness testimony on value of property and costs of repair from witness who testified that he investigated costs and obtained bids).

We similarly conclude that Angelino's and Rivera's testimony was sufficient to establish the reasonableness of the repairs to their townhouses. Their testimony established the process they undertook to select the contractors and that they each considered additional "factors" to establish the reasonableness of the costs incurred. *McGinty*, 372 S.W.3d at 627. Both women testified to the multiple bids they received and the process by which they selected the contractor that they ultimately selected. Both were cognizant of the increased demand for contracting work following each flood and the impact that demand had on pricing. Each researched the contractor she

ultimately hired by either seeing other jobs he worked on or reviewing photographs of past remodeling jobs. They both selected the lowest quote and presented documentary and testimonial evidence of the price paid. Appellants offered no contradicting evidence.

To the extent appellants argue that the jury's remedial damages awards have no basis in the record or that there was insufficient evidence for the jury to segregate the cost of repairing the flood damage to Rivera's townhouse from the cost of performing renovation work unrelated to the flooding, we disagree. Rivera testified that Martinez said he could repair the flood damage for $18,000. Rivera's contractor also gave her an invoice for $18,000 to repair her townhouse. As Rivera testified, the invoice included a list of tasks the contractor would perform. The list included work unrelated to the flooding, such as painting the townhouse, fixing the roof and ceiling, building a pantry, and installing a concrete patio. On cross-examination, Rivera testified that she did not know the cost of any line-item on the invoice. On re-direct, she testified that she paid Martinez $4,000 for extra work, for a total of $22,000, but that she was only seeking recovery for $18,000. In light of all the evidence, including evidence that other contractors quoted Rivera $75,000, $35,000, and $30,000 to repair the flood damage to her townhouse, we conclude there was some evidence to allow the jury to conclude that the reasonable cost of repairs for the flood damage to Rivera's townhouse was $14,000. The jury could determine the

31

weight and credibility to give Rivera's testimony. We must defer to the jury's determinations. *City of Keller*, 168 S.W.3d at 819.

As to the amounts the jury awarded overall, the evidence is legally and factually sufficient to support the jury's $14,000 award for Rivera and $20,000 award for Angelino. "Damages must be established with reasonable certainty, not mathematical precision." *O & B Farms, Inc. v. Black*, 300 S.W.3d 418, 422 (Tex. App.—Houston [14th Dist.] 2009, pet. denied). A jury has broad discretion to award damages within the range of evidence presented at trial. *CCC Grp., Inc.*, 450 S.W.3d at 200. "Evidence corresponding to the exact amount found by the trier of fact is not essential." *Id.* (quoting *Powell Elect. Sys., Inc. v. Hewlett Packard Co.*, 356 S.W.3d 113, 126 (Tex. App.—Houston [1st Dist.] 2011, no pet.)).

As we are limited in our analysis by the standard of review, we conclude that there is more than a scintilla of evidence for the factfinder to conclude that the remedial damages awarded to Rivera and Angelino were reasonable and necessary and that conclusion is not contrary to the overwhelming weight of the evidence.

We overrule appellants' issues related to the sufficiency of the evidence to support the remedial damages awards.

### Economic Loss Rule

Appellants contend that the economic loss rule bars Angelino and Rivera from recovering mental anguish damages and treble damages. We disagree.

Angelino and Rivera elected to recover under the DTPA. The jury found that Shafaii Investments and Raj Shafaii engaged in unconscionable actions, taking advantage to a grossly unfair degree of Rivera's and Angelino's lack of knowledge, ability, experience, or capacity as consumers. The jury also found that Shafaii Investments and Raj Shafaii engaged in false, misleading, or deceptive practices— including "[f]ailing to disclose information about an agreement that was known at the time of the transaction with the intention to induce [Rivera and Angelino] into a transaction." The jury further found that the appellants did so knowingly.

For DTPA violations, the appellees could recover economic and mental anguish damages, attorney's fees, and up to three times their economic damages. *See* TEX. BUS. & COM. CODE § 17.50(b)(1) (for acts committed knowingly, consumer may recover additional damages up to three times economic damages). Appellants allege that the economic loss rule precludes recovery of mental anguish damages because Rivera's and Angelino's losses resulted from a breach of contract. *See Stewart Title Guar. Co. v. Sterling*, 822 S.W.2d 1, 8 (Tex. 1991) (holding mental anguish and exemplary damages unavailable for breach of contract). "An allegation of a mere breach of contract, without more, does not constitute a 'false, misleading or deceptive act' in violation of the DTPA." *Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006) (quoting *Ashford Dev., Inc. v. USLife Real Estate Serv. Corp.*, 661 S.W.2d 933, 935 (Tex. 1983) (citations omitted)).

We disagree that the economic loss rule precludes recovery here. The jury found more than a mere breach of contract. The jury found that Shafaii Investments or Raj Shafaii engaged in false, misleading or deceptive acts that Rivera and Angelino "relied on to their detriment and that was a producing cause of damages." The charge defined "false, misleading, or deceptive act or practice" as specific unlawful acts found in the DTPA laundry list. *See* TEX. BUS. & COM. CODE § 17.46(b)(12), (24). Appellants do not challenge these liability findings on appeal.

Rivera and Angelino alleged and the evidence established that despite receiving payment from them for insurance, appellants failed to secure insurance for the townhouses and that appellees suffered damages as a result. Rivera and Angelino argued, and the jury found, that appellants never had any intention of providing insurance; that appellants induced appellees to purchase the townhomes and pay monthly for insurance either by representing that they would have insurance or by failing to disclose that there was no insurance. These are false, misleading, or deceptive acts within the scope of the DTPA that are not contractual in nature. The economic loss rule therefore does not preclude recovery or bar appellees from recovering mental anguish damages under the DTPA. *See Chapa*, 212 S.W.3d at 306 (stating that procuring contract by fraud is more than simple contract dispute and holding "[b]ecause Chapa proved more than mere breach of contract here, we hold she was entitled to assert fraud and DTPA claims as well.").

Having held that the economic loss rule does not preclude Angelino's and Rivera's recovery under the DTPA, we necessarily overrule appellants' argument that appellees could not recover treble damages under the DTPA. *See* TEX. BUS. & COM. CODE § 17.50(b)(1) (allowing up to three times economic damages for DTPA violations committed knowingly).

We overrule appellants' issues related to the economic loss rule and the appellees' DTPA claims.

**Mental Anguish Damages**

Appellants next assert that the evidence is legally and factually insufficient to support the award of mental anguish damages.

**A.      Standard of Review and Applicable Law**

Earlier in the opinion, we have outlined the standards for reviewing the legal and factual sufficiency of the evidence. Mental anguish awards require evidence of both the existence of compensable mental anguish and the amount of damages awarded. *Team Indus. Servs. Inc. v. Most*, 711 S.W.3d 31, 57 (Tex. App.—Houston [1st Dist.] May 16, 2024, no pet.) (citing *Gregory v. Chohan*, 670 S.W.3d 546, 555 (Tex. 2023) (plurality op.)).

"As a type of compensatory damages, noneconomic damages' purpose is to make the plaintiff whole for any losses caused by the defendant's interferences with the plaintiff's rights by placing the plaintiff in the position that she would have been

absent the defendant's tortious conduct." *Team Indus. Servs.*, 711 S.W.3d at 57. Mental anguish is a "relatively high degree of mental pain and distress" that is "more than mere disappointment, anger, resentment, or embarrassment, although it may include all of these." *Parkway Co. v. Woodruff*, 901 S.W.2d 434, 444 (Tex. 1995). Mental anguish includes the mental sensation of pain resulting from such emotions as grief, severe disappointment, indignation, wounded pride, shame, despair, and public humiliation, and recovery is warranted when the plaintiff's mental pain has risen to such a level that it has rendered her incapable of dealing with certain everyday activities like eating, sleeping, working, and socially interacting. *Katy Springs & Mfg., Inc. v. Favalora*, 476 S.W.3d 579, 595 (Tex. App.—Houston [14th Dist.] 2015, pet. denied). There are no magic words to establish mental anguish. *Id.*

"[A]n award of mental anguish damages will survive a legal sufficiency challenge when the plaintiff introduces direct evidence of the nature, duration, and severity of his mental anguish, thus establishing a substantial disruption in the plaintiff's daily routine." *Id.*; *see also Serv. Corp. Int'l v. Guerra*, 348 S.W.3d 221, 231 (Tex. 2011) (stating that when occurrence is of type for which mental anguish damages are recoverable, "evidence of the nature, duration, and severity of the mental anguish is required"). When a claimant fails to present direct evidence of the nature, duration, or severity of mental anguish, courts apply a traditional no-evidence standard of review to determine whether the record reveals any evidence of "a high

degree of mental pain and distress" that is more than mere worry, anxiety, vexation, embarrassment, or anger, to support any award of damages. *Parkway Co.*, 901 S.W.2d at 444.

**B.  Analysis**

We review whether the evidence is legally and factually sufficient to support the existence of compensable mental anguish and the amount of mental anguish damages awarded.

**1.  Angelino's Mental Anguish Award**

Angelino, a single mother of three young children, testified that she purchased her townhouse with money she earned working at a car wash. She earned $10,000-$12,000 annually. Shafaii told her she had to pay him $80 each month for insurance because he had "insurance on the whole property that covered all the houses on the property." He told her that insurance would cover her "in case of fire, in case of flood . . . ." Angelino made monthly payments to appellants for insurance, believing that should something happen to her townhouse, she would have insurance coverage.

Angelino's townhouse took on about four feet of water during Hurricane Harvey, and she had to evacuate with her young children. Her townhome suffered "a lot of damage" and all of her "furniture and belongings on the first floor [were] destroyed." When she evacuated her townhouse, Angelino believed insurance would

pay to repair her damaged home. Instead, Shafaii told her "there was no insurance" and he threatened her with jail if she did not pay to repair the townhome.

Angelino testified that when she first returned to her home, Shafaii "tried to take [her] house away from [her]." He later entered her home without permission with some men who took pictures of her home and belongings. Shafaii told her they were "from the insurance company" and that he was going to "take care of it," but he never did.[8] Shafaii told her "there was no insurance," that "it was [her] house," and "it was [her] problem." He then threatened her with jail if she did not make the repairs: "[I]f you don't fix it, I'm going to throw you in jail, and you're going to pay for the price of the house, penny after penny, because we have a contract and your signature is on that piece of paper." Angelino testified that the combination of Shafaii's failure to get insurance for her townhouse, being threatened with incarceration, having to pay Shafaii, and the stress of litigation with appellants left her unwell, and she could not sleep or eat. She testified that she usually eats "a lot," but she was unable to do so because she was "under so much stress." After she discovered there was no insurance coverage for her townhouse, she felt she had

---

[8]     Angelino testified that Shafaii told her sister, who unlike Angelino could speak some English, that the strangers in Angelino's house were from insurance and that they were going to cover all of Angelino's damages.

failed her children because they had no home, and she did not "have any place to take them."

She also testified that during the litigation, she learned that Shafaii had recorded the closing of her townhouse.[9] During the closing, she went to the restroom and she "does not know what [Shafaii] did when [she] was in the restroom." She does not "know if he recorded her when [she] was in the restroom" and that is "something that's been on [her] mind all this time." This added to her worry and inability to sleep.

Appellants argue that the evidence is legally insufficient because Angelino testified that she suffered mental anguish based on other events, such as fleeing her home during Hurricane Harvey or Shafaii recording her at the closing. When reviewing the legal sufficiency of the evidence, we "view the evidence in the light most favorable to the verdict, crediting favorable evidence if reasonable jurors could, and disregarding contrary evidence unless reasonable jurors could not." *City of Keller*, 168 S.W.3d at 807. We determine whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review. *Id.* at 824. The jury may decide the weight and credibility of the evidence and may credit all or part of any witness's testimony. *Id.* at 819; *Golden Eagle Archery*, 116 S.W.3d at 761.

---

[9]     Shafaii recorded ten minutes of the closing when he and Angelino discussed insurance. On cross-examination, he had no explanation for why he only had this part of the meeting recorded and not the entire meeting.

Unless the record demonstrates otherwise, we must presume the jury followed the instructions given. *Golden Eagle Archer*, 116 S.W.3d at 771.

Evidence that Angelino suffered mental anguish based on other sources does not negate Angelino's evidence that she suffered mental anguish based on appellants' actions; it merely raises a fact issue that the jury resolved in Angelino's favor. *See Patel v. Hussain*, 485 S.W.3d 153, 179 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (holding testimony that plaintiff engaged in day-to-day activities does not negate plaintiff's evidence of substantial disruption to her routine, it merely creates fact issue the jury resolved in plaintiff's favor). Although Angelino testified that she suffered mental anguish based on some events unrelated to appellants' actions, we do not rely on that testimony in upholding the jury's verdict for mental anguish damages.

Angelino's testimony established that she suffered a high degree of mental pain and distress because of Shafaii's actions in threatening her with incarceration and failing to procure insurance for her property. Angelino had an annual salary of $10,000 to $12,000, and she had three minor children. She and her children were displaced from her home and could not return until the house was repaired. To afford the $25,000 repairs, which was more than one-third of her home's value, Angelino had to exhaust her savings and secure a family loan. She testified in May 2021, four years after the flood damage, that her sleep remained disrupted, and she could not

40

eat. This constitutes some evidence of the nature, duration, and severity of Angelino's mental anguish sufficient to survive a legal sufficiency challenge. *See e.g. Anderson v. Durant*, 550 S.W.3d 605, 620 (Tex. 2018) (evidence that plaintiff's familial relationships were impacted, his demeanor changed, he was unable to sleep, and he was treated for anxiety and depression was some evidence he suffered compensable mental anguish). Considering the evidence presented and the reasonable inferences therefrom, the jury could reasonably conclude that in addition to incurring economic damages to repair the flood damage, Angelino suffered mental anguish caused by appellants due to the strain of dealing with repairing her townhouse without insurance and the threats of incarceration. *City of Keller*, 168 S.W.3d at 821 (reviewing courts assume jurors made all inferences in favor of verdict if reasonable minds could and disregard all other inferences).[10]

We conclude the evidence is legally sufficient to support the existence of Angelino's mental anguish stemming from appellants' actions. *See Formosa*

---

[10] *See Kelly Custom Homes, LLC v. Hopper*, No. 14-23-00793, 2024 WL 3765393, at *7 (Tex. App.—Houston [14th Dist.] Aug. 13, 2024, pet. denied) (mem. op.) (holding there was legally and factually sufficient evidence to support mental anguish damages based on evidence plaintiffs had "burned through" their savings, had to take time away from their jobs and kids, felt stress, anxiety, helplessness, and anger, and had "dark cloud" hanging over them as a result of their neighbor building a ditch that diverted water onto their property); *Vermillion v. Vermillion*, No. 07-20-00111-CV, 2022 WL 4799019, at *7 (Tex. App.—Amarillo Sept. 30, 2022 no. pet.) (mem. op.) (upholding legal sufficiency of mental anguish damages and noting trial court observed witnesses's demeanor and body language and "the raw emotion as events were re-lived" and declining to substitute judgment for that of the trial court).

*Plastics*, 960 S.W.2d at 48 (explaining that anything more than a scintilla of evidence is legally sufficient to support the challenged finding).

Further, after reviewing all the evidence relevant to mental anguish, we hold that the credible evidence supporting the finding is not so weak or so contrary to the overwhelming weight of all the evidence that the finding should be set aside and a new trial ordered. The jury's finding that Angelino suffered mental anguish is not clearly unjust or wrong. We thus hold there is factually sufficient evidence to that Angelino suffered compensable mental anguish because of appellants' actions.

To support an award of mental anguish, the evidence must also justify the amount awarded. Appellants argue that the evidence is legally and factually insufficient to support the amount of damages because "the jury essentially picked a random number out of a hat." App. Br. at 38. Although the impossibility of any exact valuation requires that juries be given a measure of discretion in finding damages, that discretion is limited. *Saenz v. Fidelity & Guar. Ins. Underwriters*, 925 S.W.2d 607, 614 (Tex. 1996). A jury must find an amount that would fairly and reasonably compensate for the loss; however, juries cannot simply "pick a number and put it in the blank." *Id.* The jury has latitude in determining the award, but it must award an amount that a reasonable person could possibly estimate as fair compensation. *Anderson*, 550 S.W.3d at 618.

The jury awarded Angelino $20,000 in past mental anguish damages caused by Shafaii Investments and $19,500 in past mental anguish damages caused by Raj Shafaii. We conclude, based on the same evidence we have already detailed above, that this award is reasonably supported by the evidence. The jury heard testimony that Angelino makes $10,000 to $12,000 annually, that she is a single mother who supported three minor children, that she bought her townhome for $65,000, that she had to pay $25,000 in repair costs she expected insurance would cover, and that she exhausted her savings and had to secure a family loan to cover the cost of the repairs. Based on this evidence, we cannot say that the jury simply "pick[ed] a number and put it in the blank." *Saenz*, 925 S.W.2d at 614. The amount awarded is not unreasonable considering other compensatory damage awards. *See Kelly Custom Homes, LLC v. Hopper*, No. 14-23-00793, 2024 WL 3765393, at *9 (Tex. App.—Houston [14th Dist.] Aug. 13, 2024, pet. denied) (mem. op.) (upholding $150,000 in mental anguish damages for damage to real property, despite award being $50,000 higher than counsel requested during closing); *MBR & Assocs. Inc. v, Lile*, 2012 WL 4661665, at *12–13, (Tex. App.—Fort Worth Oct. 4, 2012, pet. denied) (mem. op.) (affirming $250,000 mental anguish award for damage to plaintiff's home foundation that made house uninhabitable).

We conclude that the amount awarded is reasonably supported by the evidence described above, given the nature, duration, and severity of Angelino's

mental anguish. The jury could have concluded that the mental anguish damages adequately compensated Angelino for the distress she suffered over four years. Further, we hold that the credible evidence supporting the damages amount is not so weak or so contrary to the overwhelming weight of all the evidence that the finding should be set aside and a new trial ordered. *Crosstex N. Tex. Pipeline, L. P. v. Gardiner*, 505 S.W.3d 580, 615 (Tex. 2016).

We hold that the evidence is legally and factually sufficient to support the mental anguish damages awarded to Angelino.

We overrule appellants' issue related to mental anguish damages awarded Angelino.

### 2. Rivera's Mental Anguish

Turning to Rivera's mental anguish damages, Rivera testified that she was "irreparably" affected by her interactions with Shafaii, specifically related to her being falsely accused of a crime and threatened with foreclosure in manner prohibited by law. Rivera stated that, following Shafaii's actions, she was "very afraid" that he would press charges or call the police after she received Kouts's letter falsely accusing her of forging or illegally cashing the insurance check. She said that her children cried because they saw her sad, stressed, and worried. In addition to losing sleep, she testified that she became depressed and overwhelmed with anxiety, so much so that she suffered migraines. She had panic attacks and was prescribed

medication and anticipated further treatment for anxiety and depression. Rivera testified that she is "very afraid" that Shafaii will "come after" her because she filed suit against him. She testified that she worries Shafaii will retaliate and hurt her children. The day after she gave a deposition in the case, she called an ambulance because she was so stressed she could not breathe. Rivera testified that she has not been able to obtain the psychological treatment she needs because she had to pay a $4,500 bond to prevent appellants from foreclosing on her home.

Rivera's testimony is legally sufficient to establish the nature, severity, and duration of her mental anguish caused by appellants. *See Parkway*, 901 S.W.2d at 444. Rivera testified that the ordeal with appellants caused substantial disruption to her life and her relationship with her children. She described loss of sleep, and receiving treatment for anxiety and depression. Rivera testified that she was afraid of continued interactions with Shafaii during the duration of her loan. The evidence is also factually sufficient to support the existence of mental anguish caused by appellants. We cannot say we that the credible evidence supporting the finding is so weak or so contrary to the overwhelming weight of all the evidence that the finding should be set aside and a new trial ordered. We also cannot say that the finding is unjust or wrong.

As to the sufficiency of the evidence to support the amount, we disagree with the appellants that the jury simply "picked a random number out of a hat." App. Br.

at 38. The jury awarded Rivera $18,000 in past mental anguish damages caused by Shafaii Investments and $12,500 in past mental anguish damages caused by Raj Shafaii. Based on the same evidence detailed above, we hold that the amount of damages is supported by credible evidence. The jury could have reasonably concluded that the amount awarded adequately compensated Rivera for her distress. The credible evidence supporting the finding is not so weak or contrary to the overwhelming weight of all the evidence that it should be set aside and a new trial ordered.

We overrule appellants' issue related to sufficiency of mental anguish damages as to Rivera.

### Segregation of Attorney's Fees

In their final issue, the appellants argue that the jury's verdict for attorney's fees was not supported by legally and factually sufficient evidence because the attorney's fees were not properly segregated. Rivera and Angelino argue that the appellants waived this challenge by failing to object at trial. We agree.

When attorney's fees are submitted to a jury, the issue of fee segregation is likewise submitted to the jury. *Westheimer v. Ziemer*, 702 S.W.3d 621, 626 (Tex. App.—Houston [1st Dist.] 2024, no pet.) (citing *C.M. Asfahl Agency v. Tensor, Inc.*, 135 S.W.3d 768, 801 (Tex. App.—Houston [1st Dist.] 2004, no pet.)). A party who insists on fee segregation waives any segregation-related error if the trial court

submits a broad-form fee question and the party does not object that the question does not allow for segregation between recoverable and unrecoverable attorney's fees. *Westheimer*, 702 S.W.3d at 626; *C.M. Asfahl Agency*, 135 S.W.3d at 801; *see also Green Int'l v. Solis*, 951 S.W.2d 384, 389 (Tex. 1997).

Here the trial court submitted broad-form questions on attorney's fees, asking the jury to determine what amount in dollars and cents was a "reasonable fee for the necessary services of [Rivera's or Angelino's respective] attorneys" for representation through trial and completion of proceedings in the trial court. The question did not provide blanks allowing the jury to make awards for fees incurred with respect to any claim. The question and the jury's findings neither allowed the trial court nor allows this court to distinguish recoverable attorney's fees from unrecoverable ones.

Texas Rule of Appellate Procedure 33.1 requires that a party lodge a "timely request, objection or motion" to present a complaint for appellate review. TEX. R. APP. P. 33.1(a)(1). The party seeking segregation waives error when that party does not object to the attorney's fees question in the jury charge on the ground that it does not provide for segregation of any fees the jury might award among recoverable and nonrecoverable claims. *Hruska v. First State Bank of Deanville*, 747 S.W.2d 783, 784–85 (Tex. 1998); *C.M. Asfahl Agency*, 135 S.W.3d at 801. At the charge conference, the appellants objected to the legal and factual sufficiency of the

47

evidence to support submission of the attorney's fees question for each appellee, but the objection did not specifically mention failure to segregate. Although appellants later objected in a motion for new trial to Rivera's and Angelino's failure to segregate attorney's fees, appellants made no objection while the issue of attorney's fees was under consideration by the trial court or prior to the award of attorney's fees. Appellants were required to make a *timely* objection or motion and to alert the trial court of its objection to allow the court an opportunity to correct any alleged error. Raising an objection to the submission of fee segregation in the jury charge for the first time in a motion for new trial does not preserve the issue for appellate review. *Pitts & Collard, L.L.P. v. Schechter*, 369 S.W.3d 301, 322 (Tex. App.—Houston [1st Dist.] 2011, no pet.); *see also Sprague v. Roberts*, No. 11-23-002313-CV, 2025 WL 336964, at *8 (Tex. App.—Eastland Jan. 30, 2025, no pet.) (mem. op.) (citing *C.M. Asfahl*, 135 S.W.3d at 801); *Kleas v. BMC W. Corp.*, No. 03-05-00190-CV, 2008 WL 5264883, at *5–6 (Tex. App.—Austin Dec. 19, 2008, pet. denied) (mem. op.). Because appellants failed to object to the failure to segregate attorney's fees at the time in which the issue was considered by the trial court, appellants' objection post-trial is untimely, and thus, any error is waived. *See* TEX. R. APP. P. 33.1(a)(1).

We overrule appellants' complaint as to the failure to segregate attorney's fees.

**Conclusion**

We affirm the judgment of the trial court.


                                                  Susanna Dokupil
                                                  Justice

Panel consists of Justices Rivas-Molloy, Johnson, and Dokupil.